See, also, D.C., 204 F.Supp. 300.

**Milton GLICKEN and Ida Glicken, Plaintiffs,**

**v.**

**Harold K. BRADFORD et al., Defendants.**

United States District Court
S. D. New York.

Feb. 14, 1964.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs, Abraham L. Pomerantz, and William E. Haudek, and Rosenfeld & Silverman, New York City, Mordecai Rosenfeld, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for Investors Diversified Services, Inc., Samuel E. Gates, and Robert L. King, New York City, of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Investors Stock Fund, Inc., Taggart Whipple, Philip C. Potter, Jr., and Roland W. Donnem, New York City, of counsel.

White & Case, New York City, for Robert Purcell, Charles F. G. Raikes, New York City, of counsel.

Watters & Donovan, New York City, for Alleghany Corp., Thomas D. Wellington, New York City, of counsel.

Randolph Phillips, pro se.

Bennett Frankel, New York City, for Else Willheim.

RYAN, Chief Judge.

THE COURT: This matter comes before me by order citing all interested parties to show cause under Rule 23 why the proposed stipulation of settlement in this stockholders' action should not be approved by the Court as fair, adequate and reasonable. Hearings on the proposed settlement were held before me at which I heard argument and received extensive memoranda and numerous exhibits to assist me in determining whether the proposed settlement should be judicially approved.

This stockholders' derivative and representative suit was filed in March 1961 by Milton and Ida Glicken, stockholders, on behalf of Investors Stock Fund (the Fund), a mutual fund registered under the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. against Investors

Diversified Services, Inc. (IDS) and several individual and corporate defendants.

Named as defendants in addition to Stock Fund and IDS, are Alleghany Corporation, alleged to be the dominant parent of IDS, Allan P. Kirby, John D. Murchison, Clint W. Murchison, Jr., and certain of the directors of Stock Fund, some of whom were also directors of IDS. Of the defendants named, only IDS, Stock Fund, Alleghany Corporation, Robert W. Purcell, and William E. Eppler (now deceased) have been served with process or have appeared in the suit.

IDS acts as investment adviser and underwriter for the Fund under advisory and distribution agreements. The Fund is a diversified open end investment company with a long term capital growth objective.

The Supplemental and Amended Complaint herein charges, in essence:

1. That the fees and commissions received by IDS pursuant to the 1955 and 1960 investment advisory and distribution agreements between IDS and Stock Fund were excessive and unreasonable and that the payment thereof constituted a waste of Stock Fund's corporate assets and a violation of the duties imposed upon IDS and the Stock Fund directors by the Investment Company Act and applicable common law;

2. That certain of Stock Fund's directors were and are dominated and controlled by or under common control with IDS, that by reason thereof the Stock Fund Board of Directors was and is illegally constituted under the Investment Company Act and that, as a consequence, the aforesaid 1955 and 1960 agreements were illegal and void; and

3. That the individual defendants and IDS have appropriated to their own use and benefit investment advice paid for by Stock Fund. Defendants Allehany Corporation, Kirby, and the two Murchisons are alleged to have controlled IDS at various times during the period covered by the Supplemental and Amended Complaint. None of the defendants who have been served with process has answered on the merits, but they have, in the Amended Stipulation of Settlement denied the material allegations of the Supplemental and Amended Complaint and have asserted that this suit is wholly without merit.

In specific support of their complaint, plaintiffs charged that the fees for advisory services estimated on annual gross assets of between two hundred million and one billion dollars for the seven years in suit have amounted to between three and five million dollars annually, while the net underwriting commissions estimated on a graduated scale from 7½% to 1½% payable by a member of the public seeking admission have increased from 1½ million to 3½ million dollars annually. This compensation to IDS is claimed by plaintiffs to be excessive as a matter of common law quite apart from statute. On the statutory ground, plaintiffs urged that less than 40% of the Directors of the Fund were not independent or unaffiliated with the advisor contrary to the I.C.A. and that because of this the advisory contracts which they made and approved were invalid.

The proponents of the settlement introduced into evidence a total of 82 exhibits relating to all facets of the allegations of the Supplemental and Amended Complaint herein. From the defendants' standpoint, these exhibits make a very detailed disclosure of the evidence which, had this case gone to trial, defendants would have used defensively. These exhibits raise serious doubts as to plaintiffs' prospects of recovery.

Although notice of the proposed settlement and hearing was given to the shareholders of the Fund pursuant to order of the Court so that they might have the opportunity to be present at the hearing and give voice to any objections, out of approximately 270,000 shareholders, only two appeared to oppose. The two are Randolph Phillips, who owns 88

shares of the Fund appearing pro se, and his mother-in-law, Else Willheim, who owns slightly under 30 shares of the Fund appearing through her attorney, who conceded of record that the settlement was reached as a result of arms' length dealings. Phillips, allegedly on the basis of information which he said had not been disclosed to the attorney for his mother-in-law, said that he was unable to concede that there had been no fraud. This alleged information has not been brought to the attention of this Court or anyone else. Upon the Court's statement that it would not permit the raising of an unsubstantiated implication of fraud, Mr. Phillips eventually retreated to a position, while not charging fraud, of not conceding the absence of it. Any charge of fraud is plainly foreclosed.

At the outset, we dispose of objectants' contention that they were deprived of the opportunity to develop an evidentiary record of their opposition to the settlement and to cross-examine necessary witnesses, but were limited to the record made by proponents of the settlement.

The order to show cause prescribing the notice to stockholders was signed on March 5, 1963, giving stockholders seven weeks, up to April 26, 1963 to serve a notice of motion to appear and oppose and to serve briefs and papers including exhibits on all counsel in connection with the hearing set for May 7, 1963, two months thence. At the hearing, counsel for objectants orally examined counsel for plaintiff stockholders. Further, on May 7, 1963, the Court of its own motion granted objectants Phillips and Willheim an additional two weeks to examine and prepare their list of objections to the documents submitted and served upon them by proponents in support of the settlement and to prepare a specification of the witnesses objectants intended to examine and the scope and nature of the examination, and the hearing on objections was adjourned to that date.

Objectants did file a list of objections. None were directed to the authenticity of the documents submitted but rather to their weight, urging that some were hearsay—which they are not since they were well documented—and that objectants did not have the opportunity to cross-examine the affiants of affidavits submitted. Ample opportunity was given objectants to submit contradictory evidence but they did not do so. Cross-examination of the affiants was not warranted; this is not a trial and the test of the evidence which the Court should receive on a settlement is whether the proferred proof is of a nature which will aid it in passing upon the essential fairness and equity of the settlement.

The list of witnesses the opponents sought to examine comprised two groups —various officials of the Fund whom they sought to interrogate as to the truth of the allegations of the complaint, and the attorneys for proponents as to the settlement itself. The Court refused to permit such inquiry as not proper matter since the pleadings and documents spoke for themselves. On the briefs and exhibits, the matter therefore was ordered submitted.

While an objectant must be given leave to be heard, to examine witnesses and to submit evidence, it is within the Court's discretion to limit the proceedings to whatever is necessary to aid it in reaching an informed, just and reasoned decision. Cohen v. Young, 6 Cir., 127 F.2d 721.

We turn now to the Stipulation of Settlement.

In brief, the Stipulation requires IDS to enter into a new investment advisory and services agreement with the Fund, this new agreement requiring the approval of the stockholders of the Fund at their meeting to be scheduled. While the Fund has heretofore paid annual advisory fees to IDS at the rate of about ½ of 1% of its average net assets for the year, the new agreement will sub-

stantially reduce this burden by a graduated scale-down of the fee percentages, plus an additional deduction of $130,000 per year, and an agreement by IDS to assume and pay certain expenses of the Fund, all retroactive to January 22, 1963. The $130,000 deduction and the expense assumption by IDS will become effective only if the Court approves the settlement. The new agreement will continue only with the annual approval of the directors or the stockholders of the Fund; and it may, under its terms, be terminated by the Fund or by IDS at any time on 60 days' notice. The Stipulation provides, however, that for a period of ten years (from the approval of the new agreement by the stockholders of the Fund) IDS will neither seek nor accept an increase of its fee rates above those set forth in the new agreement (i. e., above the amount of fees reduced by the scaled-down percentages and by the deduction of $130,000 per year) and will, in such connection, continue to assume and pay the expenses of the Fund to the extent provided in the new agreement. Finally, the Stipulation provides that, upon approval of the settlement, any allowance of expenses and legal fees to plaintiffs or their attorneys must be paid by IDS rather than by the Fund.

The resultant saving to the Fund are computed as follows:

1. On the basis of the Fund's $1,037,217,999 net assets as of February 27, 1963, the graduated fee scale-down will yield savings of about: $172,000
2. The additional flat reduction of the fee will yield savings of: 130,000
3. The expenses heretofore borne by the Fund and now to be assumed by IDS are estimated for the calendar year 1963 at about 397,000

Total...... $699,000

(1) The graduated fee scale-down of the Investment Advisory & Services Agreement is now in effect and will continue irrespective of approval or disapproval of the settlement and in accordance with the Stipulation is not consideration for the settlement. However, as stated in Stock Fund's proxy statement, dated March 6, 1963:

"The pendency of the lawsuit relating to the existing contracts and the desire of IDS to reach a satisfactory settlement thereof contributed to the favorable changes contained in the proposed new investment advisory and services agreement. The negotiations (among representatives of Stock Fund, representatives of IDS and counsel for stockholder-plaintiffs in the pending derivative lawsuit) brought about an agreement by IDS to a new scale-down rate of advisory fees contingent solely on approval by the stockholders of (Stock Fund) with other beneficial provisions contingent also on settlement of the lawsuit."

The flat fee reduction (2) and the savings in expenses (3) are conditioned on this Court's approval and were placed in escrow as of January 22, 1963, and will be delivered over to Stock Fund when and if the settlement is approved.

To the extent that it is requisite under the Act that this advisory contract be renewed from year to year and that IDS has not bound itself to plaintiff to continue the contracts, this saving is speculative in that IDS or the Fund, in spite of the other's willingness, may at the end of a year decide not to renew the contract, but it is pointed out that, as a practical matter, there is no likelihood that IDS will of its own volition terminate its relationship with Stock Fund. IDS organized Stock Fund and has continuously for eighteen years served as its adviser and underwriter, and it appears likely to so continue. The likeli-

hood of the Fund's doing so is even more remote.

Finally, the payment of counsel and accountants' fees and disbursements will be made at such time, in such amount and in such manner as the Court may direct; provided that any award for attorneys fees shall be payable by defendant IDS in five equal annual installments. The amount so allowed or awarded by this Court shall be deemed payment in full for all litigation expenses, including attorneys and accounting fees, incurred or earned by plaintiffs, their attorneys, counsel and/or accountants in connection with this action and any other action brought by plaintiffs on behalf of Stock Fund against the same defendants, or any of them. Defendant IDS specifically reserves the right to object to or challenge the amount or nature of any such expenses including attorneys and accounting fees and disbursements. IDS will pay all of the expenses in connection with the notice to stockholders of Stock Fund of this settlement.

■ This new investment advisory agreement was submitted for approval to the shareholders of the Fund by proxy vote together with a notice of the proposed settlement. The notice was complete and fully detailed; the proxy statement met all the requirements of law. They were informed that rejection of the agreement would prevent the settlement from becoming effective, but that the agreement if approved was to go into effect at the time of their vote irrespective of judicial approval of the settlement. The vote of the shareholders was overwhelmingly in favor of the agreement. (98.36% of the shares represented were voted in favor.) While this vote was limited to the agreement, it was very significant in that a negative vote would have constituted shareholder rejection of the proposed settlement as to the terms of which they were fully advised. Shareholder approval, indirect as it was here, may certainly be taken by the Court as some indication of the fairness of the settlement. Berger v. Dyson, D.C., 111 F.Supp. 533.

This being so—that is, that the future reduction of fees is no part of settlement—this saving to the Fund per se is not before me for approval or disapproval, although it does appear that for the year 1963 at least it is a part of the overall settlement which is before me.

■ Clearly the management fee in any future year may be challenged by a stockholder and this Court's approval of it in conjunction with its approval of the entire settlement is not to be construed as a finding of fairness of the advisory fees for any future year. Lefkov v. Johnson, D.C.Mass.

Finally, the settlement provides that if it be approved by the Court judgment shall be entered:

A. *Approving this Stipulation and directing its consummation;*

B. Dismissing on the merits and with prejudice against Stock Fund, its successors and assigns and its stockholders, the Supplemental and Amended Complaint herein; and

C. Reserving jurisdiction in this action until consummation of the settlement, and over any application for attorneys fees or expenses as therein provided.

The settlement is not to be consummated until five days after the end of the time to appeal from final judgment in this action approving this settlement and dismissing this action with prejudice, without any appeal therefrom having been taken, or five days after any such appeal shall have been finally determined approving this settlement and dismissal of this action with prejudice. Defendant IDS may waive in writing any of the conditions in this paragraph provided, in whole or in part, at its discretion on notice to counsel for all parties hereto, and to this Court.

■ Before turning to a consideration of the merits of the Settlement and

of the objections we point out that the role of the Court is limited to the extent that its business judgment is not to be substituted for that of the parties who worked out the settlement, and that the only question before us is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.

On the hearing, objectant Willheim's principal objections were three:

1. That the Settlement gives the Fund too little;

2. That as a matter of law the profits to IDS as a fiduciary in 1962 were excessive;

3. That the distribution fees or underwriting commissions have been increased by about $248,000 a year on the basis of 1962 figures, which, in effect, ups the scaled down fees.

Phillips' principal objections appear to be that the settlement is illusory and without consideration because plaintiffs are powerless to commit the Board of Directors of IDS to carry out any one of the commitments alleged to be consideration for the Settlement and that insufficient evidence has been presented by proponents on the question of profits made by IDS during the past 7 years, the period in litigation, and one of the principal allegations of the complaint, to enable the Court to weigh the benefits of the Settlement.

At the special meeting of the shareholders of Stock Fund held April 6, 1963, the shareholders voted to eliminate a provision in the Stock Fund Certificate of Incorporation restricting the sales charge to a maximum of 7½%, and voted to increase the fee to 7¾%.

This, however, is no part of this Settlement or of the litigation for that matter. It affects not present but future stockholders—on whose behalf clearly no suit or settlement could be brought or effected, and therefore has nothing to do with the claims in suit or their settlement.

In their joint brief, objectants raised these points partially answered here and more fully later.

1. If the Fund were to terminate its relationship with IDS, it would lose the benefit of the flat fee reduction and such loss would be tantamount to the payment of a penalty for termination of the contract in violation of Section 15(3), I.C.A. 15 U.S.C. § 80a–15.

If the loss of benefit were to constitute such a "penalty" under the I.C.A., it becomes difficult to see how any advantageous advisory contract would be legal since termination of the contract would terminate the advantages thereunder.

2. The proposed settlement would result in an illegal contract since Minnesota law forbids a director of a corporation to "bargain away in advance the judgment the law contemplates he shall exercise at subsequent official meetings of the board". (Citing Seitz v. Michel, 148 Minn. 80, 181 N.W. 102, 104, 12 A.L.R. 1060.)

This is true in Minnesota and elsewhere but it is not very relevant here. It is IDS which is contracting under the Settlement to refuse to seek or accept for the next 10 years any fees in excess of the rate set by the new agreement. This does not limit the right of the Fund to seek a further reduction in the fee scale as new contracts are negotiated each year. The agreement only places a ceiling on the amount IDS can charge for services during the next 10 years; it does not dictate that the Fund is bound by this ceiling.

3. I.C.A. Section 15(a) (2) makes an advisory contract for 10 years illegal unless annually approved.

While this would be so, it does not apply to the proposed contract. Part Six, paragraph (1) of the proposed contract provides that its continuance "shall be specifically approved at least annually thereafter by the Board of Directors of the Company (the Fund) or by a vote of

the majority of the outstanding voting securities of the Company."

■ 4. The release of noncontributing defendants is not equitable.

In fact, as substantial shareholders of IDS, the Murchison brothers, Alleghany, and all other stockholders, automatically are contributing to the settlement by absorbing their share of its cost, and it is only equitable that the Corporation, IDS, the recipient of the allegedly excessive fees, should bear the burden of the settlement.

■ In law, "The general rule is that the release of noncontributing defendants is no reason for disapproving a compromise, Bysheim v. Miranda, Sup., 44 N.Y.S.2d 15, 30, Elmer v. Campbell, 136 Mo.App. 100, 103, 117 S.W. 622. The primary interest of the court in approving of a settlement resides in what the corporation receives in return for the grievances asserted by its stockholders in a derivative suit." (Masterson v. Pergament, 6 Cir., 203 F.2d 315, 330.)

■ Finally, objectants criticize the recommendation of Plaintiffs' counsel because they did not take pretrial depositions which presumably would have given them information essential to an assessment of the case and sworn statements of the principal defendants. It was pointed out, however, by counsel that because of the nature of the suit extensive material was available from SEC and other public files and that in addition a great deal of information not of public record was made available by defendants.

Objectants cite the holding in Cohen v. Young, 6 Cir., 127 F.2d 721, that the Court may not rely only on the advice of the attorneys who participated in the negotiations and that it must allow the objectants an opportunity to offer evidence to show the allegations of the complaint are true and to explain the settlement.

The Court is well aware of what its duty is, and we cite Fielding v. Allen, D.C., 9 F.Supp. 137, 144 for the proposition that the recommendation of experienced counsel "is certainly a fact entitled to considerable weight."

We now turn to a consideration of the charges levelled against defendants in the complaint and the defenses and evidence disclosed by them on the hearing with a view to balancing the likelihood of plaintiffs' victory on a trial and recovery of monetary benefits as against the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.

The likelihood of a financial victory by plaintiffs is a consideration which bears heavily on the fairness of the settlement proposed and the absence of collusion or fraud.

■ In assessing the relative benefits, we are not of course required to "balance the scales with the nicety of an apothecary" (Shielcrawt v. Moffett, Sup., 59 N.Y.S.2d 619, 621), for "[t]he very purpose of a compromise is to avoid the determination of sharply contested and dubious issues." In re Prudence Co., 2d Cir., 98 F.2d 559, 560, cert. den., Stein v. McGrath, 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037.

■ As required, proponents have made an extremely "detailed disclosure of the evidence which, on a trial, they would use defensively." Upson v. Otis, 2 Cir., 155 F.2d 606, 614–615. Winkelman v. General Motors Corp., D.C., 48 F.Supp. 490.

The claim of plaintiffs that the fees paid to IDS were excessive is primarily based upon the undisputed fact that the advisory fee was a fixed percentage ½ of 1% of the Fund's assets, that these assets continued to rise through the years in suit, carrying with them a continuous rise in the amount of the fees until, according to plaintiffs' contention, they finally reached a point where the fees

bore no relation to the services being performed, the extent, quality and cost of which remained the same. Thus, from net assets of $204,592,575 in 1956 and an investment advisory fee of $943,-514 there was a rise in net assets to $883,245,534 in 1962 and in advisory fees to $4,751,328, in addition to which as the Fund's assets grew the expenses of IDS allegedly remained substantially the same.

The complaint further charged that the duties performed by IDS are performed by other advisers at lower rates and at less expense to other funds, that IDS renders substantially the same investment services to its five mutual funds and that by charging each fund separate fees it multiplies its fees, that it duplicates the several funds' investments, that its investment advice to the Fund is no longer too important as the Fund has made all available investments, that its distribution fees are excessive, and that it, as well as the individual defendants, have misappropriated an asset of the Fund by investing for their own portfolios from advice paid for and belonging to the Fund.

To rebut these charges of excessive fees defendants have offered evidence to show that the fees paid to IDS have been reasonable and fair when weighed with the services rendered, that IDS furnishes extensive management services to the Fund, and that because of the interrelation of its five funds it is able to provide exceptional customer benefits.

In this connection defendants have submitted by affidavit of the Chairman of the Board of Directors of IDS, with exhibits attached, evidence showing comparison studies of Mutual Funds having the same objectives which tend to show

that IDS if not the lowest in fees charged is clearly not among the highest, but rather in the middle range.

Defendants have also shown that out of 236 mutual funds in the country, 174 of them charge ½ of 1% or more, and that the expense-to-asset ratio of defendants was lower than most, and that "a ½ of 1% rate has sometimes been referred to as the classic fee for the industry." Kerner v. Crossman, 211 F. Supp. 397, 403 (S.D.N.Y.1962).

The comparison is supported by an exhibit showing with respect to each of the 236 funds listed the type of fund, the expense-to-asset ratio of the fund for the years 1961 and 1962, the rate of the sales charge made by the fund, and the rate of the advisory fee paid by the fund.[1]

From this same affidavit it also appears that in addition to investment advice IDS has rendered various services to Stock Fund and its shareholders without additional charge: it has provided office space, and all clerical and record keeping services for Stock Fund and its 270,000 accounts; it has paid for all internal audits of Stock Fund; and substantially all of Stock Fund's legal expenses; it has paid original issuance taxes on Stock Fund's shares; prepared and transmitted replies to inquiries from shareholders of Stock Fund; issued dividend checks and reinvestment notices; made a daily determination of net asset value per share; handled all redemption requests; provided a customer relation service; and prepared and transmitted to each shareholder an annual statement of his account, information for income tax returns, and copies of Stock Fund's annual and semiannual financial statements and other shareholder reports.

1. The 236 mutual funds are listed by Arthur Wiesenberger & Co. in its publication "Mutual Fund Panorama As At December 31, 1962" (1963), a publication, together with the publication "Investment Companies," and the various supplements thereto, also published by Arthur Wiesen-berger & Co., said to be generally accepted within the mutual fund industry and the financial community as the most authoritative reference work and the primary source of information with respect to the industry. See Kerner v. Crossman, supra.

These services, say defendants, are not the usual ones provided.

This is supported by the partial comparison made in connection with "A Study of Mutual Funds" prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce.[2] In the Wharton School report it was noted that of 163 investment advisers studied, only 15 (including IDS) performed or paid for 10 or more of the 15 administrative services listed in the Wharton School questionnaire (p. 477), and it was further noted of the 22 largest advisers only 4 provide 10 or more management services to at least one of their advised open-end companies (Investors Diversified Services, Keystone, Insurance Securities Inc., and the Parker Corp.).

We are also told that among the special benefits it is able to give the Fund's shareholders are the privilege of reinvesting income dividends in shares of Stock Fund or other of the IDS-advised funds without any sales charge; transferring, without sales charge, investments from Stock Fund to other IDS-advised funds with different investment objectives; and a reduction of sales charge on subsequent purchases of Stock Fund shares by aggregating the dollar amount of concurrent as well as prior purchases of shares of Stock Fund or other IDS-advised funds.

These privileges were demonstrated by defendants not to be given or to be given in part only by most comparable funds.

As to the 23 funds which had a lower expense-to-asset ratio than Stock Fund the shareholders of only *two* funds were afforded all of these benefits,[3] the shareholders of only 18 funds were afforded some of these benefits, and those of three funds were afforded none.

Defendants demonstrate that the monetary benefit resulting to the shareholder from these privileges coupled with the lower than average sales load of the defendants[4] was greater than that resulting from a Fund having lower asset-to-expense ratio. The savings as comparatively computed were substantial.

Many of the funds charging a lower advisory fee, defendants point out, had a higher expense-to-asset ratio, thus in the long run costing the shareholders more than initially appeared. Defendants have shown that in 1962 out of 224 funds only 23 had an expense-to-asset ratio lower—43.99% of the total assets, as against 199 funds with a ratio of 56.01% of the total assets, while IDS had 54% ratio. The figures were substantially the same for 1961. Moreover, it appears that of the 23 which had a lower ratio only 4 had a lower sales load, 7 had the same, and approximately 67% of all funds had a higher load. In 1962 the average size of shareholders' accounts in Stock Fund was $3,743.32. On the basis of the 54% expense-to-asset ratio in 1962 the average shareholder was charged an investment advisory fee of $18.72 (.50% of $3,743.32), and the additional expense charged to this shareholder's account was $1.50, making a total charge of $20.22.

Objectants question the weight to be given these studies by asserting that the funds used by defendants are not comparable with the Fund in suit, which is one of the 10 largest, and most of which they say paid lower fees, that the Fund's rate of performance under IDS management was when compared with other similar managed funds "below average."

Objectants also urge that the benefits conferred by IDS upon the shareholders

---

2. Union Calendar No. 955, 2d Sess. (1962)

3. These two funds are Investors Mutual, Inc. and Investors Selective Fund, Inc., each of which is also advised by IDS.

4. For the years in suit, as we have seen, the underwriting commissions of IDS were lower than average. In fact it is conceded by Plaintiffs' counsel that they were among the lowest in the industry.

are more illusory than real in that any savings in intercompany investments to the shareholders are conferred by the Fund rather than by IDS, and that the expense-to-asset ratio of IDS is higher than others. These counter charges are unsupported by any documentation offered on the hearings or served on counsel for proponents of the settlement for their examination as required by the order of this Court.

Objectants offered no evidence although given ample opportunity to do so, but attempt belatedly to buttress the charges in their post-hearing brief with charts and documents which are not before the Court.

The settlement is to be judged on the documentary record made by defendants, since the objectants chose to make none.

In any event, the Court on this settlement is in no position and under no duty to determine which of several funds offers or offered in the years in suit the best bargain to its clients. What it does have to do is determine whether IDS offered and will offer the Fund and its shareholders adequate and fair consideration for the fees and expenses which it exacts. Whether the consideration is and was adequate, of course, can only be determined by a comparison of similar services in comparable funds—taking into account the similarities and dissimilarities of the funds compared, the respective benefits received as weighed against the fees charged, so that the Court can say that the proposed settlement is not unconscionable and is in exercise of sound business judgment.

In addition, the evidence on comparison performance has been examined by the Court on the charge of waste and spoilage by defendants in that a consistently poor performance would reflect on the advisory services rendered by its investment adviser and perhaps make the payment of any sums in the future to this adviser unfair to the shareholders, while pointing the way to likelihood of success on a trial of the issues.

As to this, we can but quote the Delaware Chancellor:

"I think it well to keep in mind the fact that the profits of (the investment adviser) can never be more than an 'indicator' of excessive payments. Large profits themselves would not be determinative. The question is whether the cost to Fund of obtaining advisory services bears some reasonable relation to the value of the services rendered." Saxe v. Brady, 184 A.2d 602, at 613 (Del.Ch. 1962).

On the basis of the defendants' showing and the concession made by plaintiffs' attorney that the performance of the Fund was average, we find that it was. This coupled with the fact that its expense-to-asset ratio was shown to be below average and that the services and benefits it received were at least above average—in exchange for which it paid a so-called "classic fee" and a low distribution fee certainly presents argument against the charge of excessiveness. At the very least, assuming a future reduction in fees were ordered as a result of a Plaintiffs' victory it renders very questionable any recovery for past profits.

As a second obstacle to Plaintiff's possible victory defendants point to the fact that the Fund has at all times made full and open disclosure of its fees to its members—both prospective and actual through its prospectuses, proxy material, and semi-annual reports; and that with full knowlege of the ratio of fees both past and present, shareholders have joined the Fund, remained in it, reinvested their dividends and continued to make purchases. In 1961 86% of all sales were made to existing shareholders, 46% by dollar value! Moreover, the shareholders overwhelmingly approved the Advisory Agreement in 1955; and, notwithstanding the very substantial in-

crease in the amount of the investment advisory fee being paid to IDS by Stock Fund, the shareholders in 1960 overwhelmingly approved the renewal of the agreement for an additional two-year period and a continuance of .5% fee by a vote, which was cast less than one year prior to the commencement of the instant lawsuit!

In short—defendants (and we cannot say that their confidence in successfully overcoming plaintiffs' charges is without foundation) were quite confident that on the common law theory at any rate plaintiffs' chances of succeeding were not too great. Defendants urge, and with some reason, that plaintiffs' attack is not really an attack against wrongdoing by IDS but rather an attack on the Mutual Fund Industry as it has developed and existed for over 20 years, and an attack which, as far as IDS was concerned, it felt would not have survived a trial.

■ Objectants reply to this is that the "overwhelming" stockholder approval of the agreements was merely pro forma approval of the resolution of the Board of Directors condemned in Brown v. Bullock, 2 Cir., 294 F.2d 415. While it may seem that the Board of Directors approval was pro forma the agreement was explained to the stockholders in the prospectuses and the figures were overwhelmingly in favor of it. Where there has been such affirmative action in the past of stockholders, the burden of showing that had they known what objectants claim they would not have approved the contract falls on objectants and it appears to be a heavy burden. Saxe v. Brady, 184 A.2d 602 (Del.Ch.1962).

■ The charge made by objectants that the shareholder vote is somehow not an informed and not complete vote in that IDS net income was not disclosed in the proxy statement is wholly baseless. The law requires no such disclosure. SEC—Rule 20a-2(b) 17 C.F.R. Sec. 270.20a-2(b); a balance sheet as of the end of the fiscal year was included in the proxy statement. Sec. 270.20a-2(a) (9).

But even more important and significant is the shareholder approval on the charge of invalidity of the advisory agreement and recovery of profits at least as to 1960–1961 by reason of a dominated Board. For even assuming plaintiffs were able to establish domination (which we shall see would have been rather difficult) the approval of the contract by a majority of the non-affiliated directors would have been unnecessary if the contract was approved by the shareholders. (Sec. 15(c) of the Act, § 80a-15, 15 U.S.C.A.)

On the charge of domination of the Board by IDS as a fact rather than in a statutory sense through "affiliation" plaintiffs' counsel's testimony at the hearing was to the effect that he would have "one tough time" in trying to prove that the unaffiliated were "dummies and dominated." That this became all too clear to him in the course of the settlement negotiations with IDS on behalf of the Fund against their "common target," when these unaffiliated directors evidenced courage and independence of action completely inconsistent with any theory of domination a conclusion which was further borne out by the documentary information received by him from them and from IDS and that their conduct on these negotiations "very largely weakened" plaintiffs' claim in this respect.

Defendants have also submitted documentary evidence tending to negate any factual control arising from business or other relationships between the Directors of the Fund and IDS.

It appears that the plaintiffs would have fared no better, even worse, on the statutory violation charge of affiliation, for here defendants submitted evidence showing that the requisite (40%) number of the Fund's Directors were "unaffiliated" with IDS under the purely objective standards of the statute (Sec. 2

(a) (3), I.C.A.1940, 15 U.S.C.A. § 80a-1 et seq.) They also submitted evidence by affidavit of counsel for IDS to show that no business dealings were had between said Directors and IDS which would constitute a violation of the I.C.A.

The sum total of these exhibits would we think have been sufficient to meet the allegation of domination.

But passing that for the moment, defendants disclose that they intended to use the further legal defense of statutory interpretation of the I.C.A.: the meaning of "control," whether it could apply to a Director, whether a finding of control could be retroactively made and whether a stockholder could seek such a finding. Sec. 2(a) (9) of the Act, 15 U.S.C.A. § 80a-2.[5]

This is of overwhelming importance to the chances of plaintiffs' victory, for if this suit were not settled it would in all likelihood be removed by defendants to the District Court of Minnesota, which is bound by the holding of its Court of Appeals. (Glicken v. Bradford, 204 F. Supp. 300 (S.D.N.Y.1962). Brouk v. Managed Funds, 8 Cir., 286 F.2d 901.)[6]

Consequently, unless plaintiffs' victory on the common law theory of control was assured this settlement is a bonus on its statutory claim.

With respect to the charge that IDS and its Directors used investment information paid for by the Fund for their own investments, defendants were prepared to show that less than 5% of the assets of Stock Fund were represented by securities found in the portfolio of IDS, and that in cases where identical securities were recommended to IDS as well as to the funds, it had been the

policy of IDS not to make a purchase for its own portfolio prior to the funds' initial purchase, nor to sell from IDS' own portfolio prior to the funds' initial sale.

In answer to the allegation that the fees were excessive in that IDS' duties are now relatively insignificant, because the Fund has invested in all suitable investments and because it renders the same advice to the other funds, defendants have shown that the Fund holds less than 4% of issues reported available for domestic investment, that its investment portfolio because of changing economic conditions must and does constantly change, that the portfolios of its five funds are not duplications, and that these funds have different objectives and place different emphasis on their portfolios requiring different investment advice.

■ Objectants challenge the legality of the consideration given by IDS in exchange for the releases to be given by Stock Fund and plaintiffs. There is nothing illegal for IDS, who has the legal right to ask for and to accept any increase in fees which the Stock Fund's shareholders might approve, to promise in exchange for a release from suit not to seek or accept any increase for the next 10 years (assuming of course that both parties renewed the advisory contract). This is perfectly valid consideration. The only question is whether it is adequate consideration for the release of the shareholders' claim, having in mind of course the likelihood of the success of the claims asserted by them.

On the side of the Fund, objectants assert that if the Board of Directors of the Fund or a majority of the shareholders

---

5. The decision of the SEC resolving these last 3 defenses in favor of shareholders reached after the Stipulation of Settlement while persuasive would not be binding on the Court. ICA Release No. 3596 Fed. Sec.L.Rep. 76,887.

6. It has already been established in a companion case that IDS and the Fund

are entitled to transfer any *statutory* action under the Act from New York to Minnesota on the ground of forum non conveniens; Ackert v. Ausman, 198 F. Supp. 538 (S.D.N.Y., 1961), mandamus denied sub nom. Ackert v. Bryan, 299 F. 2d 65, rehearing denied 299 F.2d 72 (Cir. 2, 1962).

assert their right under Section 15(a) (2) of the I.C.A. to terminate its adviser's contract it will lose this consideration.

In the first place, the future benefits which the release is intended to procure are only part of the consideration; they are present benefits for the years 1963–1964 as are the flat fee reduction and assumption of expenses. As to the likelihood of the Fund's losing this consideration by reason of termination, we are faced with the fact that in only one instance (which was rather exceptional) has a Fund terminated its advisory contract—so that we find that as a practical, rather than theoretical matter, the consideration for the release is likely to be as good as forecast. (Kerner v. Crossman, supra; Lefkov v. Johnson, supra; Archer v. Morgan, Del.Ch.Civil Action No. 1311; Rome v. Archer, Del., 197 A. 2d 49.)

It can fairly be said that the true settlement benefits to the Fund are about seven million dollars actually saved over a projected 10-year period, flowing from a flat reduction and assumption of expenses (applicable to any further reduced fee) and a graduated fee which though no part of the body of the settlement was achieved only because of its spirit.

▮▮▮▮ Objectants also argue that the settlement is illegal, or somehow improper, because the fee award which this Court may make to plaintiffs' counsel in the prosecution and settlement of this action will be paid by IDS rather than by Stock Fund. They urge that this arrangement obviously "could not but have limited the vigor of his bargaining upon behalf of the Fund," and that in any event any amount paid by IDS belongs to the Fund against which counsel could claim his fee. Ordinarily, of course, the fee of successful plaintiffs' counsel is paid by the corporation benefiting from the settlement—here the Fund. The

present settlement relieves Stock Fund of that financial burden and places it on IDS. There exists no agreement as to the amount of the fee; that matter is left entirely to the Court. The amount sought was required to be stated in the notice to shareholders and was there claimed at $800,000. IDS has reserved the right to oppose it and has stated that it intends to do so.

The provision is obviously of great advantage to the Fund, in fact it could properly be added to the benefit received by it; and since the determination of the fee is committed to the discretion of the Court and would have been fixed irrespective of who was paying it, the payment by IDS rather than by the Fund can have no possible sinister influence on plaintiffs' counsel and cannot have induced them to put forth less than their best negotiating efforts. Fistel v. Christman, D.C., 133 F.Supp. 300 is not applicable. The agreement there to pay plaintiff's lawyer a fixed amount for dismissing the suit was not proper; certainly it is not analogous to this settlement, achieving a very substantial corporate benefit.

There is a provision of the arrangement for counsel fees on which the Court would like to hear counsel—and that is the installment payment of these fees over five years. It seems preferable that payment be made once and for all, rather than to tie up IDS with this liability in the future. However, we make no such determination now but it will await the determination on the amount of the fees after all have been heard on this matter.

Objectants' bold assertion that the settlement here compares unfavorably with a settlement negotiated by present counsel with IDS on behalf of Investors Mutual Inc. (one of the other IDS advised funds) is incredible, in view of the fact that one of the objections raised by these very objectants to the settlement of that suit was that it was not as favorable as the settlement under consideration!

If such an inconsistent and irresponsible position were just an isolated instance it might be shrugged off as stemming from ignorance on the part of one not trained in the law, but it is not so isolated; it is one of the many fallacious arguments (at times accompanied by unwarranted and unjustified personal remarks directed to counsel by objectant Phillips) with which objectants have sought "to distract us from important judicial business." Unfortunately, the consideration of the objections raised here, although we have found them to be totally worthless, have taken up a great deal of the time of the Court and delayed its determination. This was not fair to anyone, including the shareholders. See concurring separate opinion in Ackert v. Pelt Bryan, 2nd Circuit, 299 F.2d 65.

From the totality of the evidence submitted and the legal arguments of counsel for proponents, including those of plaintiffs' counsel, we conclude that absent any finding of positive malfeasance such as violation of fiduciary duty or of statutory standards, it is quite conceivable that a Court or a jury would find that what plaintiffs were really challenging was the Fund System as a whole of which defendants were but a part rather than any wrongdoing on the part of defendants. Even were some sort of liability found to attach to defendants on this basis the most that plaintiff shareholders could hope for would be a reduction of fees and charges in the future rather than any repayment of past fees.

We find and conclude that the settlement is to the financial benefit of the shareholders, that counsel for both sides are well advised in recommending it and that this Court approves it and directs its consummation.

A judgment so providing is to be submitted without delay.

Jurisdiction is to be reserved for the purpose of fixing counsel fees, and for such other matters as may be set forth in the judgment.