**Judah ROSENFELD, as custodian for Joel B. Rosenfeld, et al., Plaintiffs,**

**v.**

**E. R. BLACK et al., Defendants.**
**No. 67 Civ. 1428**
**and consolidated cases.**

United States District Court,
S. D. New York.

Jan. 6, 1972.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs; by Abraham L. Pomerantz, William E. Haudek, Mordecai Rosenfeld, New York City, of counsel.

Hofheimer, Gartlir, Hofheimer, Gottlieb & Gross, New York City, for plaintiff Jack Farber; by Norman S. Nemser, New York City, of counsel.

Nemerov & Shapiro, New York City, for plaintiff Beatrice S. Frank; by Mortimer S. Shapiro, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Lazard Freres & Co., Albert J. Hettinger, Jr. and Richard H. Mansfield; by Simon H. Rifkind, Paul J. Newlon, Mark H. Alcott, Bruce S. Kaplan, New York City, of counsel.

White & Case, New York City, for defendants Dun & Bradstreet, Inc., Moody's Investors Service, Inc. and Moody's Advisors & Distributors, Inc.; by Thomas Kiernan, Morton Moskin, P. B. Konrad Knake, Jr., New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Alan H. Temple.

Walsh & Frisch, New York City, for defendant Moody's Capital Fund; by E. Roger Frisch, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for Stockholders Committee; by J. L. Greene, New York City, of counsel.

Joseph V. Heffernan, New York City, for shareholders Marion C. and Joseph V. Heffernan.

GURFEIN, District Judge.

A settlement of this derivative stockholders' action is presented to the Court for approval pursuant to Fed.R.Civ.P. 23.1. The settlement was effected after the decision of the Court of Appeals for the Second Circuit, reversing the grant of summary judgment for the defendants in the District Court, thus sending the case back for trial. The opinion of the Court of Appeals is reported at 445 F.2d 1337 and the earlier opinion of the District Court at 319 F.Supp. 891. Since these reported opinions discuss the allegations of the complaint and the affidavits on the motion for summary judgment at some length, it is unnecessary to repeat them again in detail. A brief resume of the facts will suffice to put the discussion of the matter in proper perspective.

## THE FACTS

In 1967, The Lazard Fund, Inc. (Fund) merged into Moody's Capital Fund, Inc. (Moody's Capital), and the shareholders of the fund selected Moody's Advisors and Distributors, Inc. (Advisors) as the successor to Lazard Freres & Co. (Lazard) as investment adviser.

The Fund had been founded in 1958 and became, by the terms of its initial offering, a registered open-end investment company or mutual fund.[1] Lazard had organized the Fund and served as its investment adviser. Unlike most mutual funds the Fund did not engage in continuous offering of its shares. The Fund experienced a significant shrinkage because of redemptions, and by 1966 Lazard determined, since it was unwilling to engage in continuous selling, to transfer the Fund to someone who could engage in such activity. At that time, Dun & Bradstreet, Inc. (D&B), through its subsidiary, Moody's Investors Service, Inc. (Moody's Service), was independently considering the possibility of entering the mutual fund field. Accordingly, Lazard and D&B entered into discussions which led to the Fund's proposed merger with Moody's Capital (a fund organized by D&B for the purpose of the merger). It was proposed that Advisors, a subsidiary of Moody's Service, would become investment adviser and principal underwriter to the successor fund and, in the

---

[1] An "open-end" fund is one whose shareholders may have their stock redeemed at any time in exchange for its current net asset value.

latter capacity, would engage in continuous selling.

The merger agreement was submitted to the shareholders of the Fund with an accompanying proxy statement. There was also submitted to the shareholders for approval, in accordance with Section 15(a) of the Investment Company Act of 1940 (15 U.S.C. § 80a–15(a)), the underwriting and advisory agreements. An agreement between Lazard and D&B, discussed later, was disclosed but not submitted for approval. The merger was approved on May 5, 1967 by a vote of 99% of the stock; less than 1% of the stock voted was cast in opposition.

Contemporaneous with the merger agreement, there was executed on April 5, 1967 an agreement between Lazard and D&B, mentioned above, in which Lazard gave certain commitments to D&B and was to receive in return 75,000 shares of D&B stock under conditions to be noted later. The Lazard commitments were essentially the following: (1) Lazard agreed not to compete with D&B in the entire investment business—not to become associated in a management or advisory capacity with any other registered investment company or to permit any such company, manager or adviser to use the name "Lazard" and not to act as principal distributor for any open-end investment company which makes a continuous offering of its shares and which is subject to registration; (2) Lazard agreed to provide the services of its partner, Albert J. Hettinger, Jr. to serve for five years as a consultant to D&B and its subsidiaries, and as a director of Moody's Capital and/or Moody's Fund, Inc.; (3) Lazard agreed to consult for one year on the administrative structure and operation of Moody's Capital; (4) Lazard agreed to use "best efforts" to induce certain persons performing services for the Fund to perform similarly for Moody's Capital; and (5) Lazard agreed to make available to D&B and subsidiaries all research reports and analyses that Lazard had prepared during the past nine years.

In return, Lazard was to receive 75,000 shares of restricted D&B stock to be placed in escrow, and paid to Lazard over a period of five years, provided Lazard performed all its undertakings. The last payment of 35,000 shares is to be made April 30, 1972. While in escrow, the shares were to pay no dividends and could not be sold. The stock was not registered under the Securities Act and was subject to Lazard's representation that it was acquired for investment, except that Lazard had the right, during certain periods, to require D&B to file a registration statement permitting such sale; and the right to require, subject to certain qualifications, a "piggy-back" registration if D&B should file a registration statement on its own. This agreement was disclosed in the proxy statement, but the plaintiffs have contended that the alleged failure to disclose that the 75,000 shares were really for the "sale of office" made the proxy statement misleading.[2]

## THE ISSUES

The thrust of the attack has been on the receipt of the 75,000 D&B shares by Lazard. Plaintiff Rosenfeld first sought to enjoin the stockholders meeting in the State Court, then withdrew the motion. A Federal Court action continued. It culminated in the motion for summary judgment previously described and finally in the reversal of its granting by the Court of Appeals.

The theory of the action was that the Lazard-D&B agreement was a fraud designed to cover an unlawful sale of Lazard's advisory contract, with a secret undertaking by Lazard to use its influence to induce Fund stockholders to approve D&B's subsidiary as the new investment adviser.

Judge Mansfield, then in the District Court, held that since the stockholders had approved the new advisory contract,

2. It was also contended that the description given of the stock was misleading as to its true value.

"the management's conduct in arranging such a substitution does not violate the Act, regardless how it is labelled" (319 F. Supp. at 897). He ruled that the advisory contract was not a fund asset. In view of his conclusion that there was no cause of action as a matter of law, he did not specifically rule on whether there were disputed questions of fact, although he intimated that the plaintiffs had revealed a weak case.

Chief Judge Friendly in the Court of Appeals, on the contrary, held that the Investment Company Act incorporated by implication the common law rule that a fiduciary may not sell its office for personal gain. The Court laid down a prophylactic rule forbidding the investment adviser from receiving "personal gain" on a transfer of the advisory contract. The use of the proxy machinery in favor of the successor was apparently enough to prevent the retiring adviser from being paid a consideration in connection therewith. The Court of Appeals did not, of course, consider the question whether the various covenants undertaken by Lazard were a mere sham to conceal the true nature of the payment, as the plaintiffs contended. That is a question of fact which has been remanded for trial. The Court of Appeals also held that there was a triable issue of fact with respect to the alleged deficiencies of the proxy statement.

In the meantime, Mr. Justice Marshall had extended the time for filing a petition for a writ of certiorari to afford this Court an opportunity to consider the reasonableness of the settlement. At the end of the extension, on December 10, 1971, the defendants filed their petition for certiorari.

### THE SETTLEMENT

The settlement of the derivative suits is itself quite simple. Lazard is to pay to the Fund one million dollars in cash. The money has been escrowed. All the defendants are to be released from all claims "by reason of, or in connection with, or which arise out of, any matters set forth or referred to in any of the complaints [in the consolidated action]." The settlement also purports to dismiss on the merits all actions which could have been brought by stockholders of the Moody's Capital and the Lazard Fund. In short, for the million dollar payment Lazard and its directors are to get complete absolution for their activities relating to the merger and to the approval by the stockholders of the advisory contract for the D&B subsidiary.

The jurisdiction of the Court is founded generally on the Investment Company Act of 1940 (15 U.S.C. § 80a–43); and with respect to the proxy statement, see Section 20(a) (15 U.S.C. § 80a–20(a)). See also Brown v. Bullock, 194 F.Supp. 207 (S.D.N.Y.), aff'd, 294 F.2d 415 (2 Cir. 1961).

██  The general rules governing the approval by the Court of the reasonableness of a settlement under Rule 23.1 are well known. "Compromises of disputed claims are favored by the courts." Williams v. First National Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); see Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5 Cir. 1960). Yet, "[w]hether to approve the compromise involves an exercise of discretion." West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 740 (S.D. N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir. 1971). As Judge Wyatt observed, "[a]pproval should be given if the settlement offered is fair, reasonable and adequate. . . . The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success" (ibid). The responsibility of the Court has been stated by Judge Pollack to be "the interest of the class or corporation. A compromise will be approved as 'fair,' 'reasonable' and 'adequate' if it serves that interest." Zerkle v. Cleveland-Cliffs Iron Co., 52 F. R.D. 151, 159 (S.D.N.Y.1971). Judge Ryan has gone a step further and held "that the only question before us is whether the settlement, taken as a whole, is so unfair on its face as to preclude ju-

dicial approval." Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D.N.Y.1964).

## I

Eminent counsel have forged this settlement out of lengthy negotiations. The litigating posture of each is made uncertain by the overhanging possibility of the grant of certiorari by the Supreme Court. It is common ground that the decision of the Second Circuit announced a new doctrine of fiduciary responsibility in the mutual fund industry. No matter how logical the extension of Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545 (1928) to the charges here, the interdiction of any profit to the retiring adviser is a giant step forward. This is made manifest by a comparison with the earlier decision of the Ninth Circuit in S.E.C. v. Insurance Securities, Inc., 254 F.2d 642, cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958), a decision upon which Judge Mansfield relied. Although the distinction of that case by Judge Friendly—that it arose under Section 36 of the Act and would have required a finding of "gross misconduct or gross abuse of trust"—is unquestionably sound, Judge Friendly did not hesitate to say that, in any event, the Second Circuit was not in agreement with the Ninth Circuit on the underlying view of the propriety of what Lazard did (445 F.2d at 1346). There is, in my view, an essential conflict between the circuits. While one would hesitate normally to assume the role of handicapper in the certiorari sweepstakes, in this case the Court must, under the requirements of Rule 23.1, assess the odds. My assessment is that because of the importance of the case to a large industry, the shifting views of the SEC,[3] the novelty of the result, the large number of pending suits, and the conflicting views of the Circuits (see Supreme Court Rule 19(1) (b)), there is a good chance that certiorari will be granted. At least a wise plaintiff might fear that result and adjust his thinking accordingly.

Assuming that certiorari is denied, and that certiorari is not granted in some other case from another circuit, the case is still only at the threshold of resolution. Summary judgment has been denied to the defendants but the issues of fact have been remanded for trial. The question is again one of assessment of probabilities.

While the Court of Appeals held that a claim for relief was stated if the 75,-000 shares, or any part, were to be paid to Lazard for ensuring the succession of D&B's subsidiary, it did not purport to determine the facts. The defendants have tendered rather strong affidavits by persons of reputation, including Curtiss E. Frank, then President of D&B, affirming that the negotiations with Lazard were at arms' length, that it was D&B which insisted on the negative covenant and the other clauses, and that the *total* consideration was paid for these covenants.

The plaintiffs, on the other hand, contend that these covenants were a sham to cover up payment for the secret help of Lazard in getting the investment advisory contract for Advisors. In support of their view, they point out that Lazard had indicated it was tired of the whole business and anxious to get rid of it and, inferentially, would have done so without any payment; that its earnings as investment adviser averaged only $500,000 per annum, and that D&B was nevertheless paying in stock the equivalent of $600,000 per annum for Lazard not to compete for five years. The objector Greene goes further and argues

---

3. In an early memorandum the SEC staff agreed with Judge Friendly's interpretation of the Act. In S.E.C. v. Insurance Securities, Inc., *supra*, the SEC actually put its view to the test in 1958 and lost. On the other hand, in its 1966 study on investment company growth, the SEC changed its mind, and the present Chairman, William J. Casey, doubts the viability of Rosenfeld v. Black, which terminates the heretofore widely prevailing practice of building up and selling investment advisory companies, for it is thought to stifle the growth of mutual funds. New York Times, Sept. 12, 1971, § 3, at 3, col. 1.

that, in a proposed sale of Advisors in 1970, Lazard's negative covenant which still had almost two years to run was valued at zero, while only $280,000 of the proposed $450,000 sale price was allocated by the parties to the negative covenant of D&B and Moody's Service. The short answer to the Greene contention may be that the other conditions influencing the later proposed sale and allocation of purchase price are largely unknown and that the value of a non-competition covenant must be weighted very heavily in favor of the earliest years, for it is then that competition can do the most harm.[4]

In any event, the burden of persuasion is heavy to overcome the direct testimony of the principals to the negotiations, who must be branded as less than honest witnesses if the plaintiffs are to prevail. Mr. Frank calls attention to the facts that caused D&B to make the payment to Lazard. They were well aware of Lazard's intimate relationship with the Fund. Lazard owned of record 35% of the Fund's stock, which it held for the benefit of its customers. Additional Fund stock was owned directly, in their own names, by Lazard customers. D&B was concerned that the Fund's stockholders would exercise their rights to redeem their shares once the funds merged. To minimize the redemptions they wanted to avoid an abrupt termination of Lazard's identification with the Fund and, even worse, Lazard's establishing a competitive fund. They knew that, even if Lazard did not establish its own fund, it could become an adviser or manager of a fund, leaving the continuous sales function to an independent distributor. Lazard could also serve as adviser to a closed-end fund. Finally, Mr. Frank knew that, regardless of Lazard's existing disinterest in establishing a continuous selling operation, its decision could be changed

in subsequent months or years to the detriment of the Moody's Capital.

The services of Mr. Hettinger were considered valuable by D&B especially because his continued relationship with the Fund would be some protection against large scale redemptions by followers of Lazard.

All this is grist for the mill of litigation. The trial of this action would be sharply contested on these issues on which the plaintiffs might lose. I would hesitate to substitute my own judgment on the likely outcome, even if I were permitted to do so, for the judgment of an intrepid trial lawyer like the general counsel for the plaintiffs.

The arguments concerning the adequacy of the proxy statement in the main follow the arguments on the principal issue. If the consideration was paid for the covenants in the agreement, there was no failure to disclose any secret agreement. The additional contention that there was inadequate disclosure of the market price and of the value of the 75,000 shares is not easily sustained. While the allegation has now resisted summary judgment (445 F.2d at 1349–1350), the plaintiffs still have the burden of convincing the trier of fact.

## II

Having analyzed the risks of combat, we must now consider whether the assumptions of the plaintiffs as to the maximum recovery upon a trial were adequately calculated.

The main thrust of the objectors is directed to the question of recoverable damages. They contend that the appraisal of Goldman, Sachs & Co. of the worth of the 75,000 D&B shares at the time of the contract on May 5, 1967 at approximately $18 a share, is unsupportable. They point out that the market price was then about $40 a share and that it was

---

4. Moreover, it may be noted that in 1970, unlike 1967, the mutual fund business was in the process of shrinkage, making covenants not to compete less valuable. It appears that the advisers lost money for the three years before the sale, and it is not surprising that the value of a non-competition covenant should have greatly decreased in value.

conceded in the notice of settlement given to stockholders that the value of the shares, without restrictions, would have been three million dollars ($40 per share). They argue that the restrictions should not be taken into account, because by the end of the five years Lazard would have the right to dividends, the right to have the shares registered, and would have been released from the investment commitment.

That approach is not realistic. In assessing damages, the value of the shares would, in all likelihood and as discussed below, be measured at the time of the allegedly illegal transaction. The right to receive the 75,000 shares by Lazard was at that time restricted in several ways. First, there is the commutation required for delayed delivery, since the shares were to be delivered 10,000 per year for four years, with 35,000 shares to be delivered only in April 1972, at the end of the five years; second, the shares while in escrow were not to earn cash dividends; third, the shares were delivered subject to an investment representation, and while, in some circumstances, they could be registered, there was no immediate right to sell the shares except privately at the discount prevailing for letter stock; lastly, the stock was being delivered subject to the concurrent condition of a continuing performance of its covenants by Lazard.

These restrictions are real. Their negative effect may not be precisely measurable in dollars, but the financial community has found ways to reach approximations that pass muster in the marketplace. I do not have to assume that the $18 valuation put on the shares by Goldman Sachs is precise, or even entirely objective. The Wall Street firms, even the most reputable houses, must, for obvious reasons, be suspected of taking in one another's washing, and of giving the honest benefit of the doubt to the beleaguered competitor. Yet the objectors have come up with no different appraisal, and their arguments all assume that damages would not be measured at the time of the original transaction. As we have seen, even a $40 valuation on that basis makes a maximum recovery of about three million dollars—for which a settlement of one million dollars cash, in view of the perils still to be surmounted by the plaintiffs, seems not unreasonable.

## III

The objector Greene has, however, made a broader complaint against the settlement. He contends that the litigation would result, if successful, in the imposition of a constructive trust on the shares. That would take away from Lazard all the shares, at a present market value of $60 per share, or $4,500,000,[5] plus about $250,000 in accrued dividends according to Greene's estimate. He believes that, in the face of a likely maximum recovery of $4,750,000, the settlement for $1,000,000 is niggardly and unreasonable. His assumption is, of course, that *all* the 75,000 shares will be found to have been an illegal payment, with zero ascribed to the contractual covenants. He further assumes that by the time the lawsuit is over, perhaps several years hence, the price of D&B will be at least $60, although, of course, it could be considerably less. But, more fundamentally, the basis of his argument is doubtful. That basis is that the remedy to be fashioned by the trial court would be an accounting for profits measured by the value on judgment day, or its equivalent, a constructive trust. It must be assumed, in prophesying what the trial court may do, that it will do equity. As Mr. Justice Brandeis said in Southern Pacific Co. v. Bogert, 250 U.S. 483, 497, 39 S.Ct. 533, 539, 63 L.Ed. 1099 (1919):

> "The purpose of this proceeding is not to punish the Southern Pacific, but to declare and enforce its obligation as trustee. The minority stockholders who seek equity should do equity; and a court of chancery has power in grant-

5.  It appears that the market price has further increased since oral argument.

ing relief to prevent unjust enrichment of the minority stockholders at the expense of the Southern Pacific."

The finding may well be that to the extent that Lazard violated its fiduciary duty it did not act *ex maleficio*, but merely as the result of an unawareness of a prophylactic rule later imposed by the courts to stifle temptation. If Lazard should emerge as a non-tort-feasor in the moral sense, upon whom liability has been laid as prophylaxis alone, is a court of equity likely to impose the heavy sanction of a constructive trust? That instrument of reparation is merely a remedial device. The recovery by the plaintiffs for their corporation is strictly a windfall, for they lost nothing out of their assets; nothing was converted or diverted from their use. In these circumstances, I must hazard the guess that it is unlikely that a court of equity would feel called upon to impose a sanction in the circumstances more severe than the quite adequate remedy which the law allows.[6]

### IV

The last item, which is tendered by objector Heffernan, is troublesome. It is a recurring theme that may some day have to be dealt with by the moulding of a decree by a court of higher jurisdiction. Heffernan represents stockholders of Lazard who had their shares redeemed *after* "the wrong" had been done. They contend that one of the assets of the Fund was this lawsuit, and that when they redeemed their shares they did not get their full value, but have owed to them a residual in their percentage of the recovery. They point out, not without some merit, that many stockholders who were in the Moody's Capital before the merger and some who bought after the dispositive event will indirectly share in the recovery, while those who really were entitled to recover will be left out in the cold. They also protest the condition of settlement that bars all past stockholders from asserting any cause of action.

■■ Courts of equity have almost uniformly supported the windfall for Johnny-come-lately stockholders on the fiction that they had bought a cause of action which was already lying in the womb of the corporation at the time they bought the stock. That this is a fiction is obvious, for no proof of actual knowledge of the existence of the cause of action by the stockholders or by those in the marketplace is required. The new stockholder simply shares in an augmented equity, partly because of a conceptual rigidity, and partly because it has been deemed impractical to try to find those stockholders who had really been harmed at the time of the wrong and who have sold their stock. In this day of the computer, however, we may assume that they would not be so hard to find. Neverthe-

---

6. Also arguing against the imposition of a constructive trust is the rule of 5 Scott on Trusts § 509 (3d ed. 1967). That section states that a fiduciary who is an innocent converter, as opposed to a conscious wrongdoer, is not liable for the profit realized on investment of property converted from the person to whom the fiduciary duty is owed. However, even an innocent fiduciary must return the actual property which was converted if it has not yet been invested (id. § 495); it is simple justice that the beneficiary of a fiduciary duty should be able to recover his converted property, if that is still possible, even from an innocent converter.

Where securities are directly received from a third party, rather than converted from the beneficiary, it would appear that the rule of § 509 (and not that of § 495) would govern. Since nothing was taken from the beneficiary, it should be irrelevant whether the third party paid cash which was then invested in securities by the innocent fiduciary or whether securities constituted the original payment by the third party. In either case, the innocent fiduciary is not liable for subsequent profit.

See also Equity Corp. v. Groves, 294 N.Y. 8, 60 N.E.2d 19 (1945) (even a conscious wrongdoer held not liable for profit on investment of converted property); Newman v. Stein, 68 Civ. 1398 (S.D.N.Y., Dec. 29, 1971) (McLean, J.) (regarding the lack of authority on the question of a remedy for a wrong such as that of Lazard's).

less, the distinction between a derivative suit on behalf of a corporation and a class suit on behalf of the stockholders is reasonably clear.[7] Accordingly, as a District Judge I may not do more than mention my doubts as to the fairness of treating derivative suits as limiting recovery to the corporate entity itself in *all* cases. It would, I think, be more equitable to frame decrees and judgments with less obedience to the concept of the corporate entity. But under present law, I am afraid that Mr. Heffernan has no standing. A settlement of a derivative suit should not be approved without binding all stockholders, past and present unless there is an independent claim for relief on behalf of the stockholders as a class, as distinct from the stockholders as derivative plaintiffs. Nor can the suggestion that failure to give notice to stockholders who have disposed of their stock is a violation of due process be sustained.[8] Cf. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). No class suit has been brought nor could it have been brought, for it is the corporate entity and not the stockholders here who may claim damages for the breach of fiduciary duty. The contract to act as investment adviser was, conceptually, with the mutual fund, not with its everchanging stockholders. If Mr. Heffernan has a personal contractual claim against the Capital Fund, as he seems to suggest, the *decree is not intended to bar him from* asserting such a claim within the limits of contract law or estoppel. The decree would not permit him, however, to sue the defendants in the case on the claims for relief involved herein. As to those, he will be barred as are other stockholders.

 For the reasons stated, the settlement is approved and the decree will be signed as presented.

Decision on counsel fees and other related matters will be reserved and may be disposed of at the foot of the decree.

---

7. The distinction was only once blurred in our Circuit in Perlman v. Feldmann, 219 F.2d 173 (2 Cir. 1955), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1956), when the recovery was distributed directly to the minority stockholders, eliminating the proportionate recovery for the buyers of the controlling shares.

8. Notice of the proposed settlement, pursuant to an order of this Court, was sent by mail only "to registered shareholders of the Fund . . . on October 18, 1971." Affidavit of Service by Mail, dated October 28, 1971.