Dominick **CATALANO** et al., Plaintiffs,

v.

**DEPARTMENT OF HOSPITALS OF the CITY OF NEW YORK, and New York State Department of Social Services, et al., Defendants.**

**No. 68 Civ. 3014.**

United States District Court
S. D. New York.

April 8, 1969.

Martin Garbus, and Lee A. Albert, New York City, for plaintiffs Columbia University Center on Social Welfare Policy and Law; Gabriel Kaimowitz, Sylvia A. Law and Jeffrey Cooper, of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York for New York State Department of Social Services; by Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, Hillel Hoffman, Asst. Atty. Gen., of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for Department of Hospitals of the City of New York; Edward J. Mallon, Flushing, N. Y., Samuel Stein, New York City, and Philip Agree, New York City, of counsel.

MANSFIELD, District Judge.

This class action was commenced against those responsible for the supervision and operation of the Bird S. Coler Hospital, Welfare Island, New York (the "Hospital"), by 18 patients of that Hospital on behalf of themselves and others similarly situated, all of whom receive federally-financed medical assistance pursuant to Title 42 U.S.C. § 1396 *et seq.* ("Grants to States for Medical Assistance Programs," commonly referred to as "Medicaid") and most of whom receive regular recurring federal benefit checks (primarily Social Security, Civil

Service Retirement and Veterans' benefits). The gravamen of the complaint is that defendants, as a condition to rendering medical and hospital assistance, require plaintiffs and members of their class to endorse over to the Hospital their federal and other benefit checks (which range from $75 to $200 per month) in exchange for Fifteen Dollars ($15) cash per month for personal expenditures. Defendants contend that in order to qualify for Medicaid chronically ill patients (such as plaintiffs) of the type treated at the Hospital must, pursuant to 42 U.S.C. § 1396 *et seq.*[1] ("the Medicaid program") and Title 11 of New York's Social Services Law, 52–A Consol. Laws of New York, McKinney's Consol. Laws, c. 55. § 363 *et seq.*[2] and the rules and regulations promulgated thereunder,[3] turn over all income, including benefit checks in excess of $15 a month, in order to partially defray the costs of the care provided by the Hospital. The particular regulation pointed to by defendants is found in 18 N.Y.C.R.R. Chapter 1, § 85.3 which reads in part:

"(a) For the purpose of ascertaining need for medical assistance the following income and resources shall be exempt and shall neither be taken into consideration nor required to be applied toward the payment or part payment of the cost of medical assistance:

\*    \*    \*    \*    \*    \*

"(5) net prospective income in amounts equal to the appropriate amounts allowed in the following schedules: [followed by schedules which, in part, provide a minimum

1. These sections became part of the Social Security Act by virtue of the 1965 amendments to that Act. The purpose of the amendment is set forth in 42 U.S.C. § 1396 as follows:

"For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or permanently and totally disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance."

2. In order to qualify under the Federal Medicaid Act, New York, in 1966, enacted Title 11 of its Social Welfare Law (now Title 11 of the Social Services Law). The objects of that title are declared in § 363:

"Medical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare and for promoting the state's goal of making available to everyone, regardless of race, age, national origin or economic standing, uniform, high-quality medical care. In furtherance of such goal, a comprehensive program of medical assistance for needy persons is hereby established to operate in a manner which will assure a uniform high standard of medical assistance throughout the state. \* \* \*" The statute further requires that the State Department of Social Services (originally Department of Social Welfare) "shall submit a plan for medical assistance as required by Title XIX of the federal social security act, to the federal department of health, education and welfare for approval pursuant to the provisions of such law and shall act as the single state agency to supervise the administration of the plan in this state." 52–A Consol.Laws of New York 363–a (1).

3. These rules and regulations have been created by the State Department of Social Services and State Board of Social Welfare pursuant to the authority vested in them by § 363–a(2) of New York's Social Services Law and have been submitted to and approved by the Federal Department of Health, Education and Welfare. Section 363–a(2) reads:

"The board shall make such rules and the department shall make such regulations, not inconsisent with law, as may be necessary to implement the provisions of this title."

income exemption of $2,300 for a household consisting of one member who is not a wage earner] * * *

"(iii) For the purposes of this section when a person is in *chronic care* he shall not be deemed to be a member of any household except that:

(a) *he shall be allowed a net income exemption of $15 per month for his personal expenses;* and

(b) he shall be considered a member of his former family household for the purpose of determining the amount of the savings exemptions for such family household." (Emphasis added)

Plaintiffs' complaint is directed toward this regulation and the Hospital's method of enforcing it by requiring patients to endorse over their federal benefit checks in exchange for $15 per month. Plaintiffs contend that the regulation and practice are invalid because: (1) Federal benefit checks are, by federal statute, exempt from any form of legal process designed to make such benefits usable for payment of medical care; (2) The regulation and hospital practices, which limit the chronically ill to an income of $15 per month, are inconsistent with the purposes of the controlling federal statutes, 42 U.S.C. § 1396 *et seq.*; (3) The $15 per month income exemption allowed to the chronically ill, as opposed to the substantially higher exemptions permitted for the non-chronically ill, is discriminatory and a denial of equal protection; and (4) The regulation is unauthorized by, and inconsistent with, the law of the State of New York.

Plaintiffs' 61-page complaint further charges the defendants with opening, obstructing and seizing plaintiffs' mail in violation of both federal statutes and plaintiffs' Fourth, Fifth and Fourteenth Amendment rights; and harassment and intimidation, in violation of their First Amendment rights, of those plaintiffs who sought to institute this litigation and who refused to turn over their federal benefit checks. The complaint requests, among other things, that defendants be enjoined from confiscating plaintiffs' property or opening or otherwise interfering with their mail, and that a declaratory judgment issue declaring the patients' rights to their federal benefit checks under the Federal Medicaid Act. Jurisdiction is rested primarily on federal questions, 28 U.S.C. § 1331, infringement of civil rights, 28 U.S.C. § 1343(3) and (4), and 28 U.S.C. § 1339, which deals with postal matters.[4]

Following plaintiffs' motions for summary judgment, preliminary injunctive relief and a temporary restraining order, on November 29, 1968, after hearing counsel for both sides, we issued a temporary restraining order restraining defendants from interfering with plaintiffs' mail, segregating mail which contained checks and retaining such checks, harassing plaintiffs to endorse these checks, informing plaintiffs that they had a legal obligation to endorse their checks to the hospital, and threatening to deprive plaintiffs of wheel chairs, prosthetic devices or other necessary medical care and services unless they endorsed said checks to defendants. After a lengthy hearing on December 4, 1968 we modified the temporary restraining or-

---

4. In view of the holding, *infra*, that plaintiffs are not being discriminated against so as to deny them equal protection of the laws, see 28 U.S.C. § 1343(3), jurisdiction here would be questionable except possibly as to two of the plaintiffs, Frank Hamilton and Royster McDade, who have been in the Hospital for a substantial period and receive relatively substantial benefit checks. Because their individual claims are probably in excess of $10,000, jurisdiction as to them may

be rested on 28 U.S.C. § 1331. But see, King v. Smith, 392 U.S. 309, 312 n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) ; Note, "Federal Judicial Review of State Welfare Practices," 67 Colum.L.Rev. 84 (1967). However, it is settled that claims of different plaintiffs may not be accumulated for purposes of reaching the jurisdictional amount.. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed. 2d 319 (March 25, 1969).

der by striking those paragraphs enjoining defendants from segregating mail containing checks and from informing plaintiffs that they had a legal obligation to endorse the checks to defendants. The order was so modified for the reason that orderly hospital administration required the segregation of checks and other valuables, not only to safeguard them but to ensure their personal delivery to plaintiffs, some of whom are unable to write and need assistance in endorsing checks and protecting valuables. The paragraph forbidding defendants from informing plaintiffs that they had a legal duty to endorse their checks was stricken on defendants' representation that they would not so inform plaintiffs and because all plaintiffs were aware of this suit and no irreparable injury would occur by the making of such statements.

On defendants' motion the Court further ordered the joinder of the State of New York as an indispensable party to this action when it appeared that the primary grievance was not the Hospital's activities but the regulation of the State Board of Social Welfare and the State Department of Social Services which, in practice, operated to cut off Medicaid benefits to the patients who refused to endorse their checks to defendants.

After hearing further argument and testimony on December 10, 1968, the Court gave the parties time to submit post-hearing briefs on plaintiffs' motions for a preliminary injunction and summary judgment and, the proofs having failed to establish a Hospital practice of opening mail and harassing or threatening plaintiffs to endorse the checks, requested that briefs be directed to the legality of the state regulation which, in prescribing eligibility for Medicaid benefits, distinguished between the amount of income exempted from use to offset medical expenses in the case of patients receiving "chronic care"[5] ($15 per month, or $180 per year) and other pa-

tients ($2,300 per year for an outpatient who is a member of a household and not a wage earner). Before reaching those issues, however, some discussion of the alleged harassment and mail violations is required.

■ The essence of the allegations of harassment was that plaintiffs' benefit checks were not delivered to them with their other mail, but were brought separately, the checks often removed from their envelopes, and presented to plaintiffs for endorsement. Upon endorsement plaintiffs would be given $15 and asked to sign a receipt for that amount. If a plaintiff indicated he might refuse to endorse the check, he was told that the law required him to do so and that if he refused his "case would be closed" and he might be denied essential services such as wheel chairs, crutches, glasses, dental work and other prosethic devices.

The proof revealed that upon receipt of mail in the Hospital mail room envelopes easily identified as containing checks would be sent to the property office and there arranged alphabetically for personal delivery to the patients. This procedure was not motivated by any sinister purpose, but was carried out pursuant to Hospital regulations designed to safeguard valuables and facilitate the orderly administration of the Hospital. Delivery of mail in this fashion is authorized by Postal Service Regulations, 39 C.F.R. Chapter 1, § 154.-6(a). Generally the checks were delivered unopened, though in some cases patients requested that checks be removed from envelopes, and in a few isolated occurrences a check may have been removed from an envelope without a patient's authorization. In any event, plaintiffs were unable to make any showing that checks were opened without authorization other than by occasional inadvertence, and defendants did present evidence to the effect that certain welfare checks were delivered by messenger, in bulk and without envelopes, to the

5. 18 N.Y.C.R.R. Chapter 1, § 85.3, *supra* at p. 3. Section 85.1(j) of those regulations defines "chronic care" as "inpatient care in a medical institution after 60 days of continuous care in such institutions."

8

Hospital for distribution to its patients. It is likely that this practice caused some misunderstanding on the part of patients as to how the Hospital was handling their mail. At any rate, by memorandum dated July 3, 1968, the Deputy Commissioner of New York City's Department of Hospitals specifically instructed all hospital property officers that mail should not be opened unless a patient specifically so requested and that no mail was to be delayed more than one working day.

As for the alleged threats and harassment of patients who refused to endorse their checks to the Hospital, these allegations stem from an unfortunate misunderstanding on the part of some patients who, upon being told by Hospital officials and workers for the Department of Social Services that their "case would be closed" if they did not endorse their checks to the Hospital, understandably feared that they would lose essential services and be removed from the Hospital. To the Hospital and social service workers, on the other hand, the phrase "case would be closed" meant that the patients' Medicaid benefits would stop for the reason that they would not be meeting the eligibility requirements prescribed by regulation for such benefits. However, the termination of Medicaid benefits would not end the medical assistance rendered by the Hospital. To the extent that its resources from other sources would permit it to do so, the Hospital would continue to provide services according to medical need without regard to a patient's qualification for a federal benefit program. Patients who did not endorse their checks were not discharged from the Hospital, or even threatened with discharge. In occasionally advising such patients that they might be denied certain prosthetic devices, the Hospital had in mind that when a patient no longer qualifies for Medicaid benefits, 50% of which are

supplied by the federal government, the Hospital must rely on the New York City's resources to acquire needed care and prosthetic devices, and because of the depleted state of such resources, delay in obtaining services follows until some of the City's limited funds can be allocated to meet the patient's needs.[6] The Hospital itself makes no determination as to a patient's eligibility for the Medicaid program; this is entirely the province of the Department of Social Services. The Hospital concerns itself solely with treating the patients according to their needs.

Understandably the Hospital would like those patients who can qualify for state and federal programs to do so and, because of this desire, may not have fully explained the consequences of the term "case closed" to the patients. Now that hospital staff members fully appreciate how some patients could have considered this terminology as a threat to their welfare, defendants have agreed that in the future they will avoid language that could reasonably be construed as threatening loss of services or similar action as a consequence of a patient's refusal to endorse benefit checks to the Hospital. The defendants have also advised that they will be more careful in the handling of a patient's mail and that if a patient refuses to endorse a check it will be turned over to the patient for such disposition as he wishes to make. Indeed, the July 3, 1968 memorandum from the Department of Hospitals makes clear that from that date forward hospitals should avoid opening mail and withholding checks that are not endorsed. Consequently, there having been a failure of proof as to alleged threats and violations of federal postal statutes, and the Court being satisfied that no such practices will occur in the future, its temporary restraining order is dissolved and plaintiffs' motions for a preliminary injunction and summary judgment per-

6. Note recent public releases by the Harlem Hospital to the effect that it will be forced because of inability to operate on its city budget, to take steps "discharging patients and returning the chronically ill to their homes or to the streets," N.Y.Times, March 24, 1969, p. 1.

manently enjoining defendants from engaging in such practices are denied.

There remains plaintiffs' motion for summary judgment for the declaratory relief requested in their complaint. Plaintiffs seek a declaration that:

(A) Federal benefit checks may not be attached or assigned to pay for medical care, and may not be considered "surplus income" in determining plaintiffs' income exemption;

(B) New York State Board of Social Welfare Regulation 85.3 is inconsistent with, and denies chronically ill patients rights under Title XIX of the Federal Social Security Act;

(C) The regulation discriminates against the chronically ill and denies them equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution;

(D) The Board's regulation is inconsistent with Title 11 of the New York State Social Services Law, and consequently the Board had no power to promulgate the regulation.

Finally plaintiffs seek such damages as may be merited by the circumstances surrounding each plaintiff.

*Right to Consider Federal Benefit Checks as Income Which Can be Used to Defray Medical Expenses*

■ The New York State Board of Social Welfare, for the purposes of determining eligibility for Medicaid, has defined net income to include "total income from *all* sources * * *" 18 N.Y.C.R.R. Chapter 1, § 85.1(d) (emphasis added). When patients enter the Hospital, which deals exclusively with the chronically ill, they are informed that to be eligible for Medicaid benefits they will be required to pay over all income in excess of $15 per month, from whatever source derived, including federal benefit checks. Plaintiffs contend that their federal benefit checks should not be included in the definition of "net income" and they should not be forced to turn these checks over to the Hospital.[7] In support of their contention plaintiffs point to the numerous statutes prohibiting advance assignment or transfer of federal benefits, including the Social Security Act provision, 42 U.S.C. § 407, which is typical. It provides:

"The right of any person to any *future* payment under this sub-chapter shall not be transferable or assignable, at law or in equity and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." (Emphasis added)

Since no legal process is being used to obtain these moneys, and no "lien" is being asserted against them, laws barring such action have no application. See, e. g., 42 U.S.C. § 1396a(a) (18) and New York Social Services Law § 366(3) (b). Plaintiffs' argument seems to be, therefore, that statutes such as the above were intended to assure that recipients would have unfettered discretion in the use of their benefits and New York's definition of net income contravenes that policy.

The fallacy in plaintiffs' argument is that while the statutes intend to protect benefit payments from past debts, they in no way intimate that such payments cannot be used to pay for current or future maintenance, and they therefore do not prohibit a state from taking this income into account in determining the additional benefits to which a recipient

---

7. The evidence did not show that plaintiffs were forced to endorse their checks. On the contrary, may refused, whereupon the Hospital allowed such patients to retain their checks, but did not give them a $15 monthly personal allowance. Thereupon the Hospital's right to receive credits from the Medicaid program was put in jeopardy. Consequently, the only question presented on this aspect of the case is whether New York can properly include federal benefit checks in the definition of net income used in its regulations implementing the Medicaid program.

of federal aid may be entitled. See Beers v. Federal Security Administrator, 172 F.2d 34 (2d Cir. 1949). Furthermore, regulations under the Social Security Act recognize that federal benefit checks under that Act may, and should, be applied to offset maintenance and care costs of a beneficiary confined in a state institution. See 20 C.F.R. Chapter III, §§ 404.1604 and 404.1606. Since such benefits may be used to defray the costs of a public institution in caring for a beneficiary, see, e. g., Savoid v. District of Columbia, 110 U.S.App.D.C. 39, 288 F.2d 851 (1961), the Hospital here may *request* payment for services out of these funds and the state regulations may properly take these funds into consideration in determining the extent to which an individual must help offset the costs of his care provided by a state hospital. Since the purpose of the laws relied upon by plaintiffs was to assure them funds out of the public treasury for their maintenance and care, it would indeed be a paradoxical construction that would bar such funds being taken into account in determining whether additional public funds would be required to defray the cost of such maintenance and care. Such duplication was never intended.

*Consistency of New York Income Exemption and Savings Allowance with Subchapter XIX of the Federal Social Security Act*

Plaintiffs contend that New York's Medicaid provisions which limit the chronically ill to $15 per month income, when coupled with defendants' refusal to permit plaintiffs to accumulate savings beyond an initial $1,150, violate the purpose of the controlling federal Medicaid provisions, 42 U.S.C. § 1396 *et seq.*, which states that it was enacted "to furnish (1) medical assistance on behalf of * * * individuals whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such * * * individuals attain or retain capability for *independence or self-care* * * *." 42 U.S.C. § 1396 (emphasis added). Plaintiffs argue that the $15 per month income limitation frustrates that purpose by preventing them from accumulating sufficient resources to be able to leave the Hospital and care for themselves.

The fallacy in plaintiffs' argument is that the Medicaid program is not intended to provide *financial* assistance, much less *financial* independence. Its purpose is limited to providing *medical* assistance to those whose income and resources are insufficient, thereby preventing such persons from becoming impoverished as a result of serious illness or disability and, to the extent that such *medical* assistance can do so, help them attain or retain their capability for independence and self-care.[8] Therefore, New York's limitation on accumulation of resources

8. The legislative history of the bill indicates that its purpose was to further enable states to provide medical care to those "who have enough income for their basic maintenance but not enough for medical care costs." 1 U.S.Code Cong. & Admin.News, p. 2014 (89th Cong., 1st Sess.1965). Legislative history at p. 2016 of that volume indicates Congressional determination to leave to determination of eligibility to state welfare agencies but, at p. 2020, to authorize the Secretary of Health, Education and Welfare "to issue standards * * * which * * * will protect the income and resources of the individual needed for his maintenance * * *. Such standards shall protect the income and resources of the individual needed for his maintenance and provide assurance that the responsibility placed on individuals to share in the cost shall not be an undue burden on them."
The sum of these expressions of intent is that Congress left much to the discretion of state welfare agencies, but with the proviso that they should not require cost sharing by participants which would leave them without sufficient income and resources to provide for their basic maintenance. As New York directly provides for the basic maintenance of chronic care patients, it cannot be said that New York's regulations as to these individuals contravenes expressions of Congressional intent and purpose.

and savings [9] to those accumulated prior to a determination of eligibility for Medicaid is altogether consistent with the federal program, the purpose of which is to prevent eradication of savings accumulations because of a serious illness or disability.

New York's income exemption for the chronic care patient also fits within the statutory scheme. The State provides the "chronic care" patient, unlike the out-patient, with food, room, clothing and his other basic needs. Admittedly the $15 per month exemption for personal needs of the chronically ill is not sufficient to enable the "chronic care" patient to accumulate savings, much less to give him sufficient income upon which to live at a level much above subsistence. A person with only $15 per month income hardly has sufficient income to achieve any feeling of security. But if the income exemption was substantially greater, the "chronic care" patient would be given an opportunity, not available to the out-patient,[10] to accumulate savings and increase his financial resources to a level greater than that which existed prior to his being found eligible for Medicaid benefits. Such financial assistance is not contemplated by the federal law, which seeks to prevent impoverishment due to medical costs and does not contemplate an individual accumulating savings during the period when the governments concerned provide him with medical care plus all his basic needs, free of charge. The result is that the patient is not impoverished as a result of his

illness; but at the same time Medicaid may not be used by him to accumulate monies as a result of his illness. While an increase in the $15 monthly exemption would unquestionably aid such a patient's morale, comfort, and dignity, it is not our province to take such action, which rests with the State Department of Social Services, its Board of Social Welfare, and the Federal Department of Health, Education and Welfare.

Unlike Alabama's "substitute father" regulation, which was struck down for inconsistency with the controlling federal statute in King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), New York's resources and income exemptions do not run contrary to the central purpose of the controlling federal statute. As New York's regulations do not "plainly and palpably" infringe upon the policy of an Act of Congress, they must be allowed to stand. See Snell v. Wyman, 281 F.Supp. 853, 867–868 (S.D.N.Y.1968), affd., 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed. 2d 511 (1969) (holding that New York's welfare laws and regulations requiring welfare recipients in certain instances to repay the cost of assistance benefits if they are discovered to have property, recover for injuries in a lawsuit or are entitled to insurance proceeds, are not inconsistent with Social Security provisions which grant aid to families with dependent children to enable recipients of assistance "to attain or retain capability for * * * maximum self-support and personal independence." 42 U.S.C. § 601).

It should be further noted that the Department of Health, Education and Welfare has approved New York's plan, including its income and resource exemptions, and this approval should be given great weight. King v. Smith, 392 U.S. 309, 334–335, 88 S.Ct. 2128, 20 L.Ed. 2d 1118 (1968).

9. In the case of a person with no dependents ~receiving chronic care, New York's regulations state that savings in the amount of $1,150 shall be exempt and may not be taken into consideration for the purpose of ascertaining need for medical assistance nor required to be applied toward the payment of the cost of

medical assistance. 18 N.Y.C.R.R. Chapter 1, § 85.3(a) (4). In the case of savings exemptions there is no distinction between the exemption to which the chronic care in-patient is entitled and that to which an out-patient is entitled. 18 N.Y.C.R.R. Chapter 1, § 85.3(a) (5) (iii) (b).

10. A single individual without dependents qualifying for Medicaid, but remaining in his household, or in the community, must provide himself with all the essentials of life and is entitled to an income exemption of only $2,300. Section 366, subd. 2(a) (8), New York Social Services Law.

*Equal Protection*

██ Plaintiffs' next contention is that "chronic care" patients as a class are arbitrarily discriminated against and denied the equal protection of the laws by the State's regulation which entitles them to a monthly income exemption of only $15, or $180 per year, compared to the $2,300 annual income exemption given to comparable out-patient Medicaid beneficiaries. A constitutional attack such as this one on a state-wide regulation would require us to convene a three-judge court pursuant to 28 U.S.C. § 2281 if we determined that plaintiffs have raised a substantial constitutional question. However, the question here raised is so insubstantial that such action is not required and this attack on the state regulation must be dismissed. See the discussion by this Court, and cases cited therein, in Boone v. Wyman, 295 F.Supp. 1143 (S.D.N.Y.1969).

The distinction between plaintiffs who receive all their basic needs in kind, and out-patients who are Medicaid beneficiaries but must depend on income from other sources to pay for their rent, food and other essentials, is too obvious to require extended discussion. Not only does the State bear the additional expense of providing the "chronic care" patient with food, clothing and lodging not given to the out-patient but the State must also spend far more on additional services and facilities required to care for the chronically ill, including nursing care, additional staff personnel, maintenance of records, special dietary requirements, etc. In short, the classification and different income exemption allowable to chronic care patients rests on a "reasonable basis," and consequentially, does not offend the Equal Protection Clause of the Fourteenth Amendment. See Snell v. Wyman, 281 F.Supp. 853, 865 (S.D.N.Y.1968), affd., 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

*The Regulations and the New York State Statute*

██ Plaintiffs' final contention is that the regulation limiting their income exemption to $15 per month, 18 N.Y.C. R.R. Chapter 1, § 85.3, is contrary to the law of New York State, specifically § 366 (2) (a) (8) of the Social Services Law, and therefore invalid. Plaintiffs urge that because they have presented substantial federal questions and their claims derive from a common nucleus of operative fact this Court has the power to use its pendant jurisdiction to decide plaintiffs' claim that the regulation is invalid under state law.

We have already noted the tenuousness of the federal jurisdictional basis to which plaintiffs seek to append their state claim. But regardless of that issue, "pendant jurisdiction is a doctrine of discretion, not of plaintiff's right. * * * Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1965). We believe this to be a peculiarly suitable case for the exercise of such discretion and for dismissal, without prejudice, of plaintiffs' state law claim, since it presents a question of state legislative intent and delegation of powers to an administrative body, which more appropriately lies within the ambit of the state court's expertise with respect to its own laws.

In essence plaintiffs' argument rests on an amendment to § 366 of the State Social Services Law. As originally enacted § 366(2) (a) (8) read:

"2. (a) The criteria promulgated by the board [of Social Welfare] and the standards established by the department [of Social Services] for determining eligibility under this section shall provide that at the least the following income and resources shall be exempt and shall neither be taken into consideration nor required to be applied toward the payment or part payment of the cost of medical care and services available under this title:

* * * * * *

**176**

"(8) income in such amounts as may be established by rules of the board which minimum income exemptions shall make allowance for the number of wage earners in a *household* and the number of family members in a *household* dependent on the income of such wage earners." (Emphasis added)

Pursuant to this statute the Board exercised its admittedly broad authority, see footnote 3, *supra*, to create a separate classification and exemption for the chronically ill, based upon the Board's interpretation of the term "household." See p. 3, *supra*.

In 1968 New York amended § 366(2) (a) (8) of its Social Services Law and by statute provided that the income exemption shall be $2,300 for a one family "household," a term which is not defined. The effect of this amendment is by no means clear, but it may be argued, in light of the amendment, that the Board's regulation exceeds the bounds of permissible administrative power under New York law because it establishes criteria for income exemptions that are not sanctioned by the statute and possibly contrary to its provisions. See, e. g., Matter of Federal Telephone & Radio Corp., 301 N.Y. 95, 92 N.E.2d 907 (1950); Brown v. University of State of New York, 266 N.Y. 598, 195 N.E. 217 (1935); State Board of Social Welfare v. City of Newburgh, 28 Misc.2d 539, 220 N.Y.S.2d 54 (Sup.Ct. Orange Co. 1961). In view of the nature of the question we believe it is better left for decision by the courts of New York.

Accordingly, the temporary restraining order is dissolved; plaintiffs' motions for a preliminary injunction and summary judgment are denied; and plaintiffs' claim based on the inconsistency between the state statute and regulation is dismissed in the exercise of the Court's discretion.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

It is so ordered.