Judah **ROSENFELD**, as Custodian for Joel B. Rosenfeld, Plaintiff,

v.

E. R. **BLACK** et al., Defendants.

Hyman **SAMINSKY**, Plaintiff,

v.

G. **GUND** et al., Defendants.

Beatrice S. **FRANK**, Plaintiff,

v.

**LAZARD FRERES & COMPANY** et al., Defendants.

Jack **FARBER**, Plaintiff,

v.

Richard H. **MANSFIELD** et al., Defendants.

Nos. 67 Civ. 1428, 67 Civ. 1498, 67 Civ. 1556, 67 Civ. 2016.

United States District Court, S. D. New York.

Oct. 15, 1970.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs; Abraham L. Pomerantz and William E. Haudek, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for defendants Lazard Freres & Co., Albert J. Hettinger, Jr. and Richard H. Mansfield; Simon H. Rifkind, Paul J. Newlon, and Mark H. Alcott, New York City, of counsel.

White & Case, New York City, for defendants Dun & Bradstreet, Inc., Moody's Investors Service, Inc. and Moody's Advisors & Distributors, Inc.; Thomas Kiernan, Morton Moskin and P. B. Konrad Knake, Jr., New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Alan H. Temple; Martin Schwartz, New York City, of counsel.

MANSFIELD, District Judge.

In these consolidated derivative actions by some shareholders of what was formerly The Lazard Fund, Inc. ("Fund" herein), an open-end mutual investment company registered under The Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.*, against its former individual directors, the Fund itself, Dun & Bradstreet, Inc. ("D & B" herein), and others, the defendants—other than Alan H. Temple, Lazard Fund, Inc., and its successor Moody's Capital Fund, Inc.—move for summary judgment. For the reasons stated below the motion is granted.

Plaintiffs claim

(1) that Lazard Freres & Co. ("Lazard" herein), the investment adviser to the Fund, sold its advisory office to D & B in return for 75,000 shares of D & B stock;

(2) that this sale was contrary to the Investment Company Act of 1940, 15 U.S.C. § 80a–15(a) (4) ("the Act" herein), which provides that any attempt to assign such a contract automatically terminates it, and violated defendants' fiduciary duty to the Fund's shareholders;

(3) that if the Fund's shareholders approved the sale, it was contrary to the Act, and the approval was ineffective because it was fraudulently obtained by means of a proxy statement which failed to disclose Lazard's "true motives" in accepting the 75,000 shares of D & B stock and the true value of that stock.

Defendants deny each of plaintiffs' charges, contending that there is no genuine factual issue and that even on plaintiffs' version of the facts they are entitled to judgment.

■ Certain facts are not controverted.[1] In 1958 Lazard organized the Fund, an open-end mutual investment company subject to and registered under the provisions of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.* Thereafter and until May 5, 1967, Lazard served as the Fund's investment adviser in return for fees, which are not claimed to have been excessive. As required by the Act the contract between the parties provided that it was not assignable and that any attempt to assign it would automatically result in its termination. The contract further provided that it could be terminated by either party upon sixty (60) days' notice.

The Fund, unlike many other mutual funds, did not engage in continuous public offering of additional Fund shares. Lazard knew that there would be redemptions of shares and a consequent shrinkage of the Fund, but thought that any such shrinkage would be offset by an additional offering. However, the shrinkage became so substantial that it was unlikely that an offering would offset it. Moreover, Lazard was unwilling to engage in continuous public offering of the Fund's shares, which would have required salesmen, branch offices, and promotion.

In 1966 Lazard learned that a subsidiary of D & B, Moody's Investors Service, Inc. ("Moody's Service" herein), a prominent firm engaged in the management of very substantial investments for which it served as an investment advisor, was considering entry into the mutual fund field. Lazard approached D & B and after negotiations both agreed, subject to approval of the Fund's shareholders, to merge the Fund into Moody's Capital Fund, Inc. ("Moody's Capital" herein), a wholly owned subsidiary of Moody's Service, and that Moody's Advisers and Distributors, Inc. ("Moody's A & D" herein), another wholly owned subsidiary of Moody's Service, would serve as investment adviser to the successor fund and engage in the necessary continuous selling of its shares. The successor fund proposed not only to offer its shares continuously but also to offer new varied investment programs (such as periodic payment plans), to permit stockholders to reinvest dividends (in addition to capital gains), and not to charge any fee to stockholders upon redemption.

On April 5, 1967, D & B and Lazard entered into a written contract providing that for a period of five years from the effective date of the proposed merger Lazard, which had been the Fund's investment adviser, (1) would not become associated, either in a management or advisory capacity, with any other investment company subject to registration under the Act, (2) would not permit the name "Lazard" to be used by any such investment company or adviser, and (3) would not act as a principal distributor for any open-end investment company making a continuous offering of shares, which was subject to registration under the Act.

Under the contract Lazard further agreed for a period of five years (1) to

---

[1]. The principal facts are set forth in the affidavit of Walter Fried, a Lazard partner during the entire period involved. Although plaintiffs' counsel question the competency of the affidavit on the ground that Fried was not an officer or director of the Fund, it is undisputed that Fried was one of the three persons who represented Lazard in negotiating the disputed Lazard–D & B agreement. Furthermore Lazard, of which Fried was a partner, owned * 39% of the Fund's issued stock.

Fried verified Lazard's answers to each of the four complaints, stating that he has personal knowledge and answered interrogatories, swearing that the information furnished by him was true "to his knowledge." Lastly, plaintiffs do not offer contrary affidavit proof as required by Rule 56(e), F.R.Civ.P.

We therefore accept Fried's affidavit as competent, and for reasons elsewhere stated we reject plaintiffs' contention that they should be allowed additional time to engage in further pretrial depositioning in the hope of uncovering contrary proof.

* Of record.

make available one of its partners, A. J. Hettinger, Jr., who had served as president and a director of the Fund, to review and advise with respect to European economic conditions and serve as a director of Moody's Capital, (2) to use its best efforts to induce certain key Fund personnel to perform similar services for Moody's Capital, and (3) to make available for D & B's unrestricted use a library of research reports and analyses previously prepared by Lazard. In addition the agreement provided that Lazard would consult with respect to the administrative operations of Moody's Capital for a period of up to one year.

The agreement of April 5, 1967, further provided that in consideration of Lazard's agreeing to the foregoing, D & B would transfer to Lazard 75,000 shares of D & B stock over a five-year period. The stock was to be held in escrow, with 10,000 shares to be released each year and 35,000 shares to be released at the end of the period. None of these shares could be sold during the first two years and thereafter only the stock which had been released could be transferred. Cash dividends would not be paid on such shares as from time to time remained unreleased from escrow but those shares could be voted by Lazard while subject to escrow. See generally, Lazard-Dun & Bradstreet Agreement, Moving Affidavit of Simon H. Rifkind, Ex. 2, RA 26–49. The par value of the D & B stock was $1.00 per share. Defendants claim that at the time when the agreement was negotiated *unencumbered* D & B stock was being publicly traded at $28 per share. (Aff. of Walter Fried, a Lazard partner, ¶ 28). When plaintiffs commenced their lawsuit in April, 1967, they claimed that D & B was then selling for $37.50 per share. (Compl., Rosenfeld v. Black, ¶ 8). According to plaintiffs' figure, the total value of the 75,000 shares of unencumbered D & B stock was about $2.8 million. Defendants claim that since the shares were encumbered for a period up to five years their value at the time of the agreement was far less than the current market price. In view of the basis for our

decision, however, the issue as to the value of the shares becomes immaterial.

It is the payment of the 75,000 D & B shares to Lazard that forms the basis of the present lawsuit. Plaintiffs claim that the true consideration for the shares was the sale or transfer of Lazard's position as investment adviser to the Fund rather than the various obligations undertaken by Lazard under the terms of the agreement itself. Plaintiffs further contend that while the Lazard-D & B contract of April 5, 1967, did not result in any out-of-pocket loss to the Fund, Lazard's position as investment adviser to the Fund nevertheless represented an asset of the Fund requiring Lazard to turn over to the Fund the 75,000 shares allegedly received for that Fund asset.

Defendants assert that the true consideration for the 75,000 shares was the various aforementioned obligations undertaken by Lazard in the contract itself, which were of considerable value to D & B; and that the Fund suffered no loss but on the contrary benefited from the merger, since the new mutual fund has (pursuant to the agreement) engaged in continuous selling of Fund shares, has permitted stockholders to reinvest dividends, does not charge any fee to stockholders on redemption, and has not increased the advisory fee paid by the Fund. Defendants make the further contention, which is the more important one for purposes of their motion, that, even accepting *arguendo* plaintiffs' claims as to the consideration paid for the 75,000 shares, Lazard's office as investment adviser did not constitute an asset of the Fund and neither Lazard nor D & B were under an obligation to turn over the shares to the Fund.

Before considering these respective contentions a few more undisputed facts bearing upon stockholder approval of the merger should be mentioned. By notice and proxy statement dated April 6, 1967, the Fund's shareholders were advised that its directors had approved the merger of the Fund into Moody's Capital, subject to approval by the Fund's share-

holders. By a proxy statement dated April 6, 1967, the Fund's directors advised its stockholders that the board had approved the merger into Moody's Capital, subject to stockholder approval, and that the proposed merger would be submitted to the stockholders for their approval or rejection at a special meeting to be held on May 5, 1967. The proxy statement attached copies of the proposed merger agreement and the investment advisory agreement between Moody's Capital and Moody's A & D. It also set forth (at p. 7) a description of all of the material terms of the April 5, 1967, Lazard-D & B agreement, including the undertaking that "As consideration for such agreements, Dun & Bradstreet, Inc. will deliver to Lazard Freres & Co. 75,000 shares of its common stock, par value $1 per share," with a description of the terms with respect to the escrowing of the 75,000 shares, payment of dividends, etc.

On April 11 and 12, 1967, certain stockholders of the Fund commenced the present suit in this court and a similar action in the Supreme Court, New York County, seeking to enjoin the merger and delivery of the 75,000 shares of D & B stock on the grounds already described by us above. Thereupon, by letter dated April 14, 1967, the President of the Fund advised its stockholders of the institution of the suits and of the substance of the allegations of the complaints, including specifically the charge "that Lazard Freres dominates and controls the Fund and its board of directors, that the agreements described in the proxy statement would constitute a sale by Lazard Freres of its investment advisory contract with the Fund and a sale by defendants of their fiduciary offices * * * and that the transactions described in the proxy statement are unlawful and would constitute a gross abuse of trust." [2] The letter expressed the opinion that the stockholder-plaintiffs were not entitled to injunctive relief and that the merger would be submitted to the stockholders at the May 5, 1967, meeting. New proxies were enclosed.

2. The letter of August 14, 1967, states in part:

"A stockholder of Lazard Fund, Inc. has brought suits on April 11 and 12, 1967 in the United States District Court for the Southern District of New York and the New York Supreme Court, allegedly on behalf of the Fund, to enjoin the voting of Fund shares in favor of the proposed merger of the Fund into Moody's Capital Fund, Inc. and the related matters described in the notice of special meeting, to enjoin the delivery and transfer of the 75,000 shares of common stock of Dun & Bradstreet, Inc. in accordance with the agreement between Dun & Bradstreet and Lazard Freres & Co. described in the proxy statement and for judgment requiring the defendants to account to the Fund for the defendants' profits and the Fund's losses. The defendants named are directors of the Fund, Dun & Bradstreet, Inc., Moody's Investors Service, Inc., Moody's Advisors & Distributors, Inc., Moody's Capital Fund, Inc., and Lazard Freres & Co. Both complaints allege among other things that Lazard Freres dominates and controls the Fund and its board of directors, that the agreements described in the proxy statement would constitute a sale by Lazard Freres of its investment advisory contract with the Fund and a sale by defendants of their fiduciary offices, that the transactions described in the proxy statement would deprive the stockholders of the Fund of their freedom to elect directors, investment advisors and auditors and that the transactions described in the proxy statement are unlawful and would constitute gross abuse of trust. It is expected that the defendants will in due course serve answers denying liability and asserting that the proposed merger is in the best interest of the Fund and its shareholders. Since it is the opinion of the Fund's counsel that the plaintiff is not entitled to the injunctive relief demanded in the complaint, the matters specified in the notice of special meeting will be submitted as scheduled to the stockholders of the Fund on May 5, 1967.

\* \* \* \* \*

"An additional form of Proxy has been enclosed for your convenience in case you have not already voted or wish to change your vote with respect to the proposed merger."

At the May 5 meeting more than 99% of the shares present were voted in favor of the merger. More specifically, of 5,217,256 shares entitled to vote, 4,269,346 shares (or more than 81%) were voted in favor of the merger and agreements and 38,545 shares, or less than 1% of those voting were voted against it.

Since the merger has now been consummated, plaintiffs seek damages (i. e., payment of the 75,000 D & B shares or their monetary value) as the principal remedy.

### Discussion

In order to recover plaintiffs must establish two essential elements by a fair preponderance of the evidence: (1) that the true consideration or motive for D & B's transfer of 75,000 of its shares to Lazard was Lazard's sale of its position as investment adviser to the Fund, and (2) that this sale violated the Act or was a breach of its fiduciary duty to the Fund's shareholders. In view of the overwhelming approval of the merger by the Fund's stockholders after being informed of plaintiffs' claims, plaintiffs must also show that the proxy was fraudulent or misleading.

Turning to the first of these essential elements, the evidence supporting plaintiffs' contention as to defendants' motive in accepting the 75,000 D & B shares is so extremely thin, in the face of solid proof sustaining defendants' position, that upon a trial we would probably be forced to set aside a verdict in plaintiffs' favor. Plaintiffs are not aided by their contention that since defendants are in exclusive possession of the true facts as to their motives in accepting the 75,000 shares summary judgment should be denied until plaintiffs have had an opportunity to proceed with further pretrial discovery and depositions. After initially availing themselves of thorough pretrial discovery by interrogatories, plaintiffs have for the last 2½ years failed to pursue the various other pretrial discovery procedures that were available to them.

Despite plaintiffs' sound and fury to the effect that their own laches in this 3½-year old lawsuit should not preclude their availing themselves of further pretrial discovery pursuant to Rule 56(f), we prefer to be guided by the basic principle expressed by the Second Circuit in Schneider v. McKesson & Robbins, Inc., 254 F.2d 827, 830–831 (2d Cir. 1958), to the effect that

> "[Appellants'] failure to make use of the discovery procedure is also destructive of the contentions that they have not had a sufficient opportunity to to test the veracity of facts stated in the supporting affidavits, * * * "

In that case summary judgment was granted seven months after the complaint was filed. See also Instituto Per Lo Sviluppo Econ. Dell.' I. M. v. Sperti Prod. Inc., 47 F.R.D. 310, 317 (S.D.N.Y.1969) (six months delay); Chung Wing Ping v. Kennedy, 111 U.S.App.D.C. 106, 294 F.2d 735, 737 (1961) (10 months delay); Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762, 765–766 (1952) (Prettyman, J.) (approximately 2-year delay).[3]

In the face of persuasive evidence supporting defendants' position, plaintiffs' case boils down to the argument that the very fact that Lazard agreed to receive 75,000 shares from D & B raises a genuine factual issue as to Lazard's true motives, which bars summary judgment. If the motion could not be disposed of on other grounds, we would be called upon to decide whether plaintiffs' case amounts to a "mere 'hunch' or 'suspicion' of a cause of action," Waldron v. Cities Service Co., 361 F.2d 671, 673 (2d Cir. 1966), aff'd sub nom. First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), or

---

3. The holdings of these cases are not changed by Dolgow v. Dillon Anderson, (2d Cir. Sept. 2, 1970, Dkt. No. 33719. In that case the court, in overruling a lower court decision granting summary judgment, noted that plaintiffs' discovery had been restricted. *Id.* at Slip Opinion pp. 4206–09, 4212. But it had been restricted by a court. In this case any restrictions or delays concerning discovery were self-imposed.

whether they have raised their case above the Plimsoll line and shown that there is " 'the slightest doubt as to the facts,' " Dolgow v. Anderson, —— F.2d —— (2d Cir. 1970), quoting Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945) (Frank, J. concurring). Since, as we conclude below, defendants are entitled to summary judgment as a matter of law on other grounds, however, it is unnecessary for us to decide whether there is a genuine factual dispute as to the true motive of Lazard.

Turning to the second essential basis of plaintiffs' claim—that Lazard's sale of its position as investment adviser to the Fund violated the Act—we recognize that Congress has shown great solicitude for the protection of shareholders of investment companies. Among other things investment advisory contracts are carefully regulated by the Act, which requires that all such contracts must be submitted to the investment company's stockholders for initial approval and then submitted annually either to the directors or stockholders for approval or rejection. 15 U.S.C. § 80a–15(a). Any attempt to assign an investment advisory contract automatically terminates it. 15 U.S.C. § 80a–15(a) (3). Congress has further provided that the investment adviser's contract must state that it is automatically terminated if the investment adviser assigns it. 15 U.S.C. § 80a–15(a) (4). An "assignment," as it is defined by the Act, includes

> "any direct or indirect transfer or hypothecation of a contract or chose in action by the assignor, or of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor; * * *." 15 U.S.C.A. § 80a–2(a) (4).

Congress' purpose was to prevent assignments from being made by investment company managers without the consent of the shareholders. The Act itself expressly declares its intent to be to protect investors which are "adversely affected"

"when investment companies are reorganized, become inactive, or change the character of their business, or *when the control or management thereof is transferred, without consent of the security holders*; * * *." 15 U.S.C.A. § 80a–1(b) (6). (Emphasis added.)

Where (as here) a majority of the stockholders approve a new advisory contract, as they are empowered to do by 15 U.S.C. § 80a–15(a), the management's conduct in arranging such a substitution does not violate the Act, regardless how it is labelled. Nothing in the Act bars the management from terminating the exising contract and presenting a new one to the shareholders for approval. Indeed it would be extraordinary if such conduct were prohibited, since the effect would be to lock the shareholders into the initially-approved advisory agreement. Faced with this issue courts have recognized that with the shareholders' consent, a new investment advisory agreement or an agreement with a transferee of control of the adviser may be effectively consummated. S.E.C. v. Insurance Securities Inc., 254 F.2d 642, 651 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958); Goodman v. Von Der Heyde, CCH Fed. Sec.L.Rep. ¶ 92,541 at 98,494 (S.D.N.Y. Dec. 22, 1969); Rome v. Archer, 41 Del. Ch. 404, 197 A.2d 49, 56 (1964); Krieger v. Anderson, 40 Del.Ch. 363, 182 A.2d 907, 910 (1962).

Plaintiffs, however, argue that the existing advisory contract was an asset of the Fund, transfer of which for gain to D & B violated defendants' statutory and common law fiduciary duty to the shareholders. We cannot accept the basic assumption that the contract is a Fund asset. It is undoubtedly true that each such agreement, as long as it is in effect, is of value to the adviser because of the fees it generates. It is likewise of value to the investment company, which receives advisory service that hopefully will lead to profitable investments for it and its stockholders. See Jaretzki, The Investment Company Act: Problems

Relating to Investment Advisory Contracts, 45 Va.L.Rev. 1023, 1032 (1959). Even assuming Lazard's position, while the contract here was in force, to be that of a fiduciary, see Brown v. Bullock, 294 F.2d 415, 421 (2d Cir. 1961) (en banc),[4] the Fund could not require it to render services beyond the 60-day termination period. Nor was the contract assignable by either party. Thus Lazard was free, upon 60 days notice, to cease rendering service to the Fund and to render its service elsewhere.

The argument that an advisory contract is an asset of the advisee which the adviser may not sell, either by transfer, sale of control of the adviser, or similar means, has been rejected by all courts to which it has been addressed, and has been abandoned by the SEC, which first put it forth. In S.E.C. v. Insurance Securities, Inc., 254 F.2d 642 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 13 L.Ed.2d 64 (1958) ("ISI" herein), the controlling stockholders of an investment adviser to the trust fund, an open-end diversified management company registered under the Act, undertook to sell a control block of their stock at a price amounting to $4.24 million in excess of the net book value of the shares, obtaining approval of the trust fund's stockholders. The SEC sued, contending

"that when the sale of control of the investment adviser or principal underwriter involves receipt of consideration in excess of net asset value, 'gross misconduct' or 'gross abuse of trust,' under § 36 is involved. The excess, it is contended, represents payment for succession to the adviser's or underwriter's fiduciary office and undertakings.

"It is also [the SEC's] position that the value attached to service contracts is an asset of the investment company. The stockholders of an investment adviser having such a contract may not, according to this view, appropriate this

asset to themselves by selling a controlling stock interest in the service company for a price in excess of asset value.

\*    \*    \*    \*    \*    \*

"The specific question presented by [the SEC's] argument is whether transfer of control of an investment adviser and principal underwriter at a price in excess of net asset value constitutes 'gross misconduct or gross abuse of trust in respect to' an investment company which it serves, within the meaning of § 36 of the act," 254 F.2d 642 at 647–648.

The Ninth Circuit Court of Appeals, affirming dismissal of the charges, held that the service contract "does not represent an asset of Trust Fund," stating:

"The value which the contract has for the service company lies in the fact that it receives a profit for rendering such service for the stipulated fees. Trust Fund contracted to pay such fees, and cannot claim any share in the profits thereunder.

"The price of service company stock, over and above net asset value, is based largely upon the expectation that the service contract will be renewed and profits will continue to be received. This prospect no more represents an asset of Trust Fund than do the current profits to the service company, as received. The price received by appellee-directors for their stock in the service company did not come from the coffers of the investment company, but from outside purchasers." 254 F.2d at 650–651.

See also Report of the SEC on the Policy Implications of Investment Company Growth, H.R.Report No. 2337, 89th Cong., 2d Sess. 149–53 (Govt. Printing Office 1966), where the SEC recognized that it is appropriate for the retiring management to expect and receive some compensation for the elements of value in the relationship between the service

4. Although the court referred in passing to the directors and investment advisers of an investment company as "fiduciaries" the case dealt only with the duties of fund directors, so that the reference to the duty of an adviser was dictum.

company and the Trust Fund since the retiring management has built up this value over the years. Furthermore, not allowing management to capitalize on its contract could hurt the Fund since such a rule would discourage existing management from surrendering its relationship and providing "the Fund with new and possibly more effective management." *Id.* at 152. This more recent position of the SEC is in stark contrast to what it espoused in the *ISI* case. The Commission concluded:

> "[E]xisting law does not adequately protect the interests of investment company shareholders against harm resulting from sales of management organizations. It believes that a fuller measure of protection can be given *without* interfering with the ability of investment company managers to dispose of their interests in advisory organizations. Accordingly, the Commission recommends [to Congress] that the Act be amended to prohibit any sale of the assets of or a controlling block of stock in an investment company management organization if the sale, or any express or implied understanding in connection with the sale, is likely to impose additional burdens on the investment company or to limit its freedom of future action. The Commission should be expressly authorized to institute actions to enforce this prohibition and to intervene as a party in any private action brought for that purpose." *Id.* (Emphasis added.)

We have already noted, *supra* at p. 5, that the new advisory contract placed no burdens on the Fund but instead benefitted it greatly.

As the court recognized in *ISI*, the evil toward which the Act is directed is the transfer of control without consent of the shareholders, *id.* at 648–649, 651,

not the money received by the assignors of service contracts. When the stockholders approve there is no violation of the Act. *Id.* 651. See discussion of legislative history of the Investment Company Act, in *id.* at 651 n. 15. See also Report of the SEC, *supra*, at 150 and n. 207. *ISI* has been uniformly followed.

The same reasons leading us to the conclusion that on plaintiffs' own version of the facts there was no violation of the Act persuade us that there was likewise *no breach of defendants' common law fiduciary duties as asserted in plaintiffs' pendent claim.*[5] The authorities relied upon by plaintiffs, which were unsuccessfully put forth by the SEC in *ISI*, are wholly inapposite and need not be considered at length. McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899), dealt with sale of a corporate fiduciary's office without its stockholders' knowledge or approval. Here more than 99% of the voting shareholders approved the new advisory contract with full knowledge of all material facts. Nor are we here faced with clandestine looting of a corporate treasury, which was the sordid picture in Moulton v. Field, 179 F. 673 (7th Cir. 1910), also relied on by plaintiffs, or the use by fiduciaries of corporate funds or inside information for their private profit.

Turning to plaintiffs' contention that fraudulent proxies were used to obtain stockholder approval of the merger and of the new advisory contract with Moody's A & D plaintiffs make two claims of fraud. Their major contention is that there was fraud because Lazard did not state that its "true motive" was the sale of its advisory office. According to plaintiffs Lazard should have stated in effect that it was being bribed, and that it was selling its office in return for 75,000 shares of D & B stock. We are unpersuaded.

---

5. In view of plaintiffs' failure to state a claim arising under federal law, our pendent jurisdiction is questionable. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); McFaddin Express Inc. v. Adley

Corp., 346 F.2d 424, 427 (2d Cir. 1965), cert. denied 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966); Catalano v. Dept. of Hospitals, 299 F.Supp. 166, 175 (S.D.N.Y.1969).

The original proxy statement, dated April 6, 1967, gave defendants' version of the facts, which of course did not include any statement to the effect that Lazard was motivated by the desire to sell its advisory office. Then plaintiffs, on April 11, 1967, instituted their suits making their present claims as to improper motive. Thereupon the Fund's management sent out its letter of April 14, 1967, to the Fund's stockholders advising them of plaintiffs' contentions, including their claim that the agreements "would constitute a sale by Lazard Freres of its investment advisory contract and * * * by defendants of their fiduciary offices * * * and would constitute a gross abuse of trust."

Thus the proxy information gave both defendants' and plaintiffs' sides of the story. Without confessing to a selfish motive on Lazard's part it presented all the necessary facts to the Fund's shareholders so that they might draw their own inferences as to motive. We think that was sufficient. As the court noted in Doyle v. Milton, 73 F.Supp. 281, 286 (S.D.N.Y.1947):

> "[P]resumably a proxy statement may be false or misleading if it omits data from which the inference of selfish motive may be drawn. Our question is narrower: Assuming the data are supplied, is the proxy statement nevertheless false if it omits a confession of selfish motive.
>
>   *   *   *   *   *   *
>
> "Until the Commission speaks my answer * * * is no."

Over 99% of the Fund's voting shareholders, after having been given both sides of the dispute, decided that the evidence did not warrant the conclusion that defendants acted from a selfish motive. We will not presume to second-guess their decision. Plaintiffs, dissatisfied with the judgment of the shareholders, would have the court decide the "ultimate truth" as to the true motive of Lazard. But plaintiffs have already been given ample protection. The shareholders were required to evaluate motives. We accept their decision and have no reason to sus-

pect that our evaluation would be any better than theirs. "[E]ven courts have been known to make rulings thought by counsel to be erroneous." Crane v. Hahlo, 258 U.S. 142, 148, 42 S.Ct. 214, 216, 66 L.Ed. 514 (1922).

Under plaintiffs' view there could never be summary judgment in any case in which plaintiffs attacked defendants' "true motives." No amount of disclosure —except a confession of bad motives— would protect any defendant from a trial. We think such a rule is unwarranted, and it is not the law.

Lastly plaintiffs argue that the shareholder approval of the new advisory contract with Moody's A & D in accordance with 15 U.S.C. § 80a–15(a) did not constitute approval of the Lazard-D & B contract. But the Act did not require approval of the latter agreement. Cf. Acampora v. Birkland, 220 F.Supp. 527, 549–550 (D.Colo.1963). The important thing is that there was a full disclosure to the shareholders of all relevant facts needed by them to decide whether to approve the new advisory contract, which defeats plaintiffs' fraud claims.

As a second and subordinated claim, plaintiffs charge that there was fraud because the proxy statement of April 6, 1967, failed to reveal the value of the 75,000 D & B shares. This omission, it is charged, is made more misleading because the stockholders were told the par value of the stock, which is only $1 per share, while the value of 75,000 shares of D & B stock (assuming it to be unencumbered) was allegedly $2.8 million.

Although defendants did fail to list the market value of the stock, under the circumstances this was not misleading. The D & B stock *was* encumbered and its value, with its restrictions, which were listed in the proxy statement, was not readily determinable. Furthermore, the *present* market value of D & B stock, which is publicly traded, was not required to be disclosed, since it was equally available to all parties. Walpert v. Bart, 280 F.Supp. 1006, 1015 (D.Md. 1967), aff'd per curiam, 390 F.2d 877 (4th Cir. 1968); See Hafner v. Forest

Laboratories, Inc., 345 F.2d 167, 168 (2d Cir. 1965). In any event the value of the D & B stock was of doubtful materiality for the reason that the shares were to be paid by D & B, not the Fund, so that they did not represent any payment by, or loss to, the Fund or its shareholders. On the contrary, the Lazard-D & B contract benefitted the Fund to the extent that Lazard was required to render to it the various services outlined above.

The motion for summary judgment is granted.

It is so ordered.